ANDREW P. BRIDGES (CSB No. 122761)
abridges@fenwick.com
JEDEDIAH WAKEFIELD (CSB No. 178058)
jwakefield@fenwick.com
SEAN S. WIKNER (CSB No. 268319)
swikner@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:      415.875.2300
Facsimile:      415.281.1350

Attorneys for Defendant and Counter-Claimant
FITBIT, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| FITBUG LIMITED,  a United Kingdom Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>FITBIT, INC., a Delaware Corporation,<br><br>Defendant. | Case No.: 13-cv-01418-SC<br><br>**DEFENDANT FITBIT, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, WITH MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:          December 12, 2014<br>Time:         10:00 am<br>Judge:        The Honorable Samuel Conti<br>Courtroom: 1, 17th Floor |
| FITBIT, INC., a Delaware Corporation,<br><br>Counter-Claimant,<br><br>v.<br><br>FITBUG LIMITED,  a United Kingdom Limited Liability Company,<br><br>Counter-Defendant. | |

**[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]**

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 2

I.    INTRODUCTION................................................................................. 2

II.    FACTUAL BACKGROUND ................................................................. 3

    A.    Fitbit ............................................................................................. 3

    B.    Plaintiff's Failed U.S. Launch............................................................. 4

    C.    Plaintiff's Knowledge of, and Continued Focus on, Fitbit ........................ 5

    D.    Plaintiff's Attempts to Get a Free Ride on Fitbit's Name and
    Reputation ...................................................................................... 6

III.    ARGUMENT ..................................................................................... 7

    A.    Legal Standard. .............................................................................. 7

    B.    Laches Bars Plaintiff's Claims........................................................... 8

        1.    Plaintiff's Delay Was Unreasonable. ......................................... 8

            a.    Plaintiff Delayed Filing Suit for Over Four
            and Half Years.................................................................. 9

            b.    Laches Presumptively Bars Plaintiff's Claims
            Because it Filed Suit Outside the Two-Year
            Statute of Limitations for an Analogous State-Law
            Claim. ........................................................................... 11

        2.    Plaintiff Has No Valid Excuse for its Delay. ............................... 13

            a.    The Doctrine of Progressive Encroachment Does Not
            Apply. ........................................................................... 13

            b.    Plaintiff's Belated Cease-and-Desist Letter Does Not
            Negate Plaintiff's Delay.................................................... 15

            c.    The E-Systems Factors Compel a Finding that Plaintiff's
            Delay Was Unreasonable. ................................................. 16

        3.    Fitbit Will Suffer Severe Prejudice as a Result of Plaintiff's
            Delay. .............................................................................. 18

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

C. Fitbug Acquiesced in Fitbit's Use of the FITBIT Mark, Barring its Claims. ................................................................................................ 19

IV. CONCLUSION ...................................................................................... 22

Fenwick & West LLP
Attorneys at Law
San Francisco

## <u>TABLE OF AUTHORITIES</u>

CASES                                                                                          PAGE(S)

*Ambrosia Chocolate Co. v. Ambrosia Cake Bakery*,
 165 F.2d 693 (4th Cir. 1947)...................................................................................20

*Coach House Rest., Inc. v. Coach & Six Rests., Inc.*,
 934 F.2d 1551 (11th Cir.1991)...............................................................................20

*Cusano v. Klein*,
 264 F.3d 936 (9th Cir. 2001).................................................................................12

*Danjaq L.L.C. v. Sony Corp.*,
 263 F.3d 942 (9th Cir. 2001)..................................................................15, 17, 18

*Dr. Seuss Enters., L.P. v. Penguin Books USA*, Inc.,
 109 F.3d 1394 (9th Cir. 1997)..................................................................................9

*E-Systems, Inc. v. Monitek, Inc.*,
 720 F.2d 604 (9th Cir. 1983)......................................................................9, 16, 17

*FLIR Sys., Inc. v. Sierra Media, Inc.*,
 965 F.Supp.2d 1184 (D. Or. 2013) .......................................................................15

*Groupion, L.L.C. v. Groupon, Inc.*,
 826 F.Supp.2d 1156 (N.D. Cal. 2011) ..................................................................15

*Grupo Gigante Sa De CV v. Dallo & Co. Inc.*,
 391 F.3d 1088 (9th Cir.2004).....................................................................9, 16, 18

*Guess, Inc. v. Superior Court*,
 176 Cal. App. 3d 473 (1986)..................................................................................12

*High Country Linens, Inc. v. Block*,
 No. C 01-02180 CRB, 2002 WL 1998272 (N.D. Cal. Aug. 20, 2002)....................12

*Holt v. Kormann*,
 No. SACV 11-1047 DOC MLG, 2012 WL 2150070 (C.D. Cal. June 12, 2012) ....21

*Internet Specialties W., Inc. v. ISPWest*,
 No. CV05-3296FMCAJWX, 2006 WL 4568073 (C.D. Cal. Nov. 14, 2006) ..........11

*Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*,
 559 F.3d 985 (9th Cir. 2009)..............................................................................9, 11

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
 304 F.3d 829 (9th Cir. 2002)...............................................................................8, 11

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Matsunoki Grp., Inc. v. Timberwork Oregon, Inc.*,
No. C 08-04078 CW, 2011 WL 940218 (N.D. Cal. Feb. 18, 2011) ........................................15

*Miller v. Glenn Miller Prods.*,
318 F. Supp. 2d 923 (C.D. Cal. 2004) ....................................................................................11

*Miller v. Glenn Miller Prods., Inc.*,
454 F.3d 975 (9th Cir. 2006)...................................................................................... *passim*

*Mission Imports, Inc. v. Superior Court*,
31 Cal. 3d. 931 (1982) (*en banc*) ..........................................................................................12

*Murphy v. Hartford Acc. & Indem. Co.*,
177 Cal. App. 2d 539 (1960)...................................................................................................12

*Polar Bear Prods., Inc. v. Timex Corp.*,
384 F.3d 700 (9th Cir. 2004)...................................................................................................12

*Saul Zaentz Co. v. Wozniak Travel, Inc.*,
627 F. Supp. 2d 1096 (N.D. Cal. 2008) ...................................................................... *passim*

*Seller Agency Council, Inc. v. Kennedy Center for Real Estate Educ., Inc.*,
621 F.3d 981 (9th Cir. 2010).............................................................................................19, 20

*Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ ., Inc.*,
No. SA CV 06-679 AHS, 2011 WL 1211477 (C.D. Cal. Mar. 30, 2011) ..............................20

*SunAmerica Corp. v. Sun Life Assur. Co. of Canada*,
77 F.3d 1325 (11th Cir. 1996).................................................................................................20

*Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*,
465 F.3d 1102 (9th Cir. 2006)...............................................................................8, 13, 14, 16

**STATUTES**

California Civil Code
§ 2300...........................................................................................................................................21

California Code of Civil Procedure
§ 337...........................................................................................................................................11
§ 339..................................................................................................................................11, 12
§ 343...........................................................................................................................................12

Lanham Act.............................................................................................................................8, 11

**OTHER AUTHORITIES**

6 McCarthy on Trademarks and Unfair Competition § 31:42 (4th ed.)............................................21

Federal Rule of Civil Procedure 56..............................................................................1, 3, 7,

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

**TO:   PLAINTIFF AND ITS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on December 12, 2014, in Courtroom 1 of the United States District Court for the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, California, at 10:00 am or as soon thereafter as this matter may be heard, Defendant Fitbit, Inc. ("Fitbit") will and hereby does move pursuant to Federal Rule of Civil Procedure 56 for summary judgment that the doctrines of laches and acquiescence bar the claims of Plaintiff Fitbug Limited ("Fitbug").

The motion is based upon this Notice of Motion and the Memorandum of Points and Authorities, the declarations of Jedediah Wakefield, James Park and Amy McDonough accompanying this motion, all evidence and exhibits submitted with the motion, all the pleadings and evidence of record in this matter, and such argument of counsel as the Court may allow.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

This is a trademark infringement case between two makers of wearable electronic fitness trackers, who—like many other companies in the fitness field—use the word "fit" in their trademarks.  Plaintiff Fitbug, Limited, a UK company, claims earlier rights in its "fit"-based name.  As a consequence, it seeks millions of dollars in damages and an injunction barring Defendant Fitbit from use of its FITBIT mark, which Fitbit built into an extremely well known and highly respected brand over the years that Plaintiff—after praising and encouraging Defendant—took no action.

The uncontroverted evidence establishes that Plaintiff was well aware of Fitbit's successful launch in 2008.  Rather than expressing any concern, Plaintiff affirmatively complemented Fitbit, sought to collaborate by linking Plaintiff's service to Fitbit's product, and even proposed selling Fitbit products to Plaintiff's customers.  After sending its initial notes of encouragement, Plaintiff then waited over four and half years, watching Fitbit continuously and successfully invest in its brand, before filing suit.  In those years of Plaintiff's silence on brand issues, Fitbit has steadily grown from a successful startup to become a leader in the fitness tracker market.

Plaintiff has no excuse for its long delay.  It had actual knowledge at the highest levels of management that Defendant was using the name and mark Fitbit.  Plaintiff quickly identified Fitbit as a "competitor."  It even claims to have been concerned about the Fitbit name in 2008.  The undisputed facts further show that Plaintiff continuously focused on Fitbit, bidding on "Fitbit" as an Internet advertising "keyword," launching press releases that "explicitly linked Fitbit and Fitbug," and promoting itself  as "Fitbit  . . . for the B2B market."  Plaintiff also launched a deceptive advertising campaign, searching out reviews of Fitbit on the Internet and posting phony consumer recommendations for Plaintiff's products instead.  It was only after learning that Fitbit was raising a $30 million round of financing that Plaintiff filed this opportunistic lawsuit.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    If the Court now permits Plaintiff to proceed on its claims after such an unreasonable

2  delay and after its own affirmations of Fitbit's activities, Fitbit will suffer irreparable prejudice

3  and will lose the value of its massive investment in its highly successful business.  Accordingly,

4  as a matter of law, the doctrines of laches and acquiescence bar Plaintiff's claims, for both past

5  damages and injunctive relief.

6  **II.    FACTUAL BACKGROUND**

7    **A.    Fitbit**

8    Defendant Fitbit, Inc. is a leading provider of fitness trackers and other personal fitness

9  related devices.  Declaration of James Park ("Park Decl."), at ¶ 42.  Fitbit products are widely

10 available to consumers online and in traditional retailers such as Best Buy, Target and Wal-Mart.

11 *Id.* at ¶ 29.  Fitbit also widely sells and distributes its products through corporate partners,

12 including insurance companies and corporate wellness providers.  *Id.* at ¶ 28; Declaration of Amy

13 McDonough ("McDonough Decl."), at ¶ 4-5.

14   James Park and Eric Friedman founded Fitbit in March 2007 in San Francisco.  Park Decl.

15 at ¶ 2.  In late July 2007, Eric and James conducted a poll using Facebook's opinion polling tool

16 to assess consumer responses to a number of potential names, including Fitbit.  *Id.* at ¶ 4-5, Exs.

17 1-2.  Fitbit won, and James and Eric selected it as the name for their new company.  *Id.*  The

18 Fitbit name suggests both fitness and digital technology (e.g., "bits" of data).  When they picked

19 the name, no one at Fitbit had ever heard of Plaintiff or was aware of a "Fitbug" brand.  *Id.* at ¶ 6.

20   On August 18, 2008, Fitbit filed an application for federal registration of the FITBIT

21 mark, which the U.S. Patent and Trademark Office published on January 20, 2009 and registered

22 (Reg. No. 3,732,334) on December 29, 2009.  Park Decl. at ¶ 47, Ex. 32.  Notably, the PTO found

23 that the Fitbit mark did not create a likelihood of confusion with any other registered marks,

24 notwithstanding Plaintiff's earlier registration for its FITBUG mark.  *Id.* at ¶ 55, Ex. 39.  Fitbit

25 went on to register five other FITBIT-formative marks.  *Id.* at ¶¶ 48-52, Ex. 33-37.

26   On September 9, 2008, Fitbit announced its launch at a major technology conference,

27 TechCrunch 50, and introduced the original Fitbit fitness tracker.  *Id.* at ¶ 10.  The original Fitbit

28 fitness tracker incorporated an accelerometer that allowed users to track steps and distance, and

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

record calories burned. *Id.* at ¶ 11. Customers could wirelessly transmit collected data, review their data on the Fitbit.com website and access a diet monitoring system. *Id.*

Immediately upon its launch, Fitbit gained widespread recognition from technology enthusiasts. TechCrunch named Fitbit one of five runners-up at TechCrunch 50. *Id.* at ¶ 12, Ex. 3. CNET similarly named Fitbit's original fitness tracker one of the top ten products from among over 120 companies that presented at TechCrunch 50 and a similar start-up conference, DemoFall. *Id.* at ¶ 12, Ex. 4.

By September 10, 2008, Fitbit's website at *www.fitbit.com* featured images of FITBIT brand fitness trackers and a description of their features. *Id.* at ¶ 13, Ex. 5. This website was publicly available, and any potential customer could click "buy" to place pre-orders for a Fitbit product. *Id.*

Since publicly launching in 2008, Fitbit has grown consistently. *See id.* at ¶¶ 37-38, Exs. 16-17. As Fitbit has grown, so too have its product lines and associated press and media coverage. *Id.* at ¶¶ 30-32, 44-45.

### B. Plaintiff's Failed U.S. Launch

Plaintiff Fitbug is a United Kingdom company with its headquarters in London. *See* Complaint [Dkt. No. 1] ("Compl.") ¶ 4. Plaintiff's CEO, Paul Landau, founded the company in 2004. Wakefield Decl. ¶ 2, Ex. 1 at 15:7-8; 64:3-6. Plaintiff offers online fitness tracking services with associated tracking and reporting devices it generically calls "bugs." *See* Compl., at ¶¶ 7, 10; Wakefield Decl., ¶ 46, Ex. 43. Historically, Plaintiff has distributed third party devices, including pedometers by Omron, that it rebranded with the FITBUG mark. *Id.* at ¶¶ 2, 5, Ex. 1 at 35:8-19, Ex. 4.

Plaintiff's initial market was in the United Kingdom, but, in late 2005, it contracted with Brunswick New Technology to enter the U.S. market. *Id.* at ¶ 2, Ex. 1 at 26:6-27:13. That arrangement was short-lived: Brunswick New Technologies closed within months. *Id.* Plaintiff is unsure about the number of FITBUG-branded devices, if any, that Brunswick distributed. *Id.*

After the failure of the Brunswick deal, Plaintiff essentially had no presence in the United States. It had no U.S. distributor and its products were not on sale in any U.S. stores. It had no

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    offices and no employees in the U.S., and it spent no money on U.S. advertising.  In 2008, the

2    year Fitbit launched, Plaintiff claimed total U.S. sales of ██████████. *Id.*at ¶ 8, Ex. 7.  The

3    following year, Plaintiff had only $██████ in total U.S sales, *id.*, with the sale of only ██ units.

4    *Id.*  Thus, at the time Fitbit launched, Plaintiff was virtually unknown in the U.S.

5       **C.      Plaintiff's Knowledge of, and Continued Focus on, Fitbit**

6          Immediately upon Fitbit's launch in September 2008, Plaintiff had actual knowledge of

7    Fitbit and its activities in the marketplace.  █████████████████████████████████

8    ██████████████████████████████████████████████████████████████

9    ████████████████████████████████.  Wakefield Decl., at ¶¶ 11-20, Exs.

10   9-18.  ████████████████████████████████████████████

11   ███████████████████.  *Id.*

12         Thereafter, Plaintiff routinely monitored Fitbit and its product capabilities.  *Id.* at Exs. 34,

13   38, 40.  By late 2009, Fitbug discussed the need to ██████████████████████████

14   ████████████████████████.  *Id.* at Exs. 28, 30.  Fitbug went so

15   far as to ask its Chief Marketing Officer, Dennis Skigen ██████████████████████

16   ████████████████████████████.  *Id.* at Ex. 38.  Plaintiff similarly

17   monitored Fitbit's product features to keep up with technical developments.  For example, on

18   February 16, 2010, █████████████████████████████████████████████

19   ████████████████████████████.  *Id.* at Ex. 33.  Similarly, when Fitbit

20   announced its mobile application, ██████████████████████████████████

21   ███████████████████████.  *Id.* at Ex. 36.  In yet another example, in September 2011, a

22   Fitbug employee forwarded an excerpt from Fitbit's website and wrote: ████████████████

23   █████████████████████████.  *Id.* at Ex. 39.

24         As Fitbit's stature continued to grow, Plaintiff began overtly to tie its name to Fitbit.  In

25   November 2011, Plaintiff retained its first U.S. public relations firm, Savoir Media, ████████

26   ████████████████████████████.  *Id.* at Ex. 41, at FITBUG010149.

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Two months later, Plaintiff issued a pair of press releases that Fitbug Holdings PLC[1] Executive Chairman Fergus Kee characterized as "█████████████████████████████████ ████████████  *Id.* at Ex. 44.

Plaintiff's deliberate association of itself with Fitbit extended beyond its marketing and advertising activities.  In efforts to raise money and solicit new customers, Mr. Landau and Mr. Kee regularly █████████████████████████████████████████████ ███████████████████████████."  *See, e.g., id.* at Exs. 42-43.

### D.   Plaintiff's Attempts to Get a Free Ride on Fitbit's Name and Reputation

After over three years of emulating Fitbit and attempting to cash in on Fitbit's growing name and reputation, on December 9, 2011, Plaintiff, for the first time, sent a letter to Fitbit accusing it of trademark infringement.  Park Decl., ¶ 26, Ex. 11.  Fitbit promptly responded, denied all claims, explained why Fitbug's allegations were baseless, and pointed out that laches barred Fitbug's claims.  *Id.* at ¶ 26, Exs. 12.

After receiving Fitbit's unequivocal denial, Plaintiff took no action for another fifteen months.  *See id.*at Exs. 13-15; Dkt. No. 1.  During that time, Plaintiff expanded its efforts to trade on the FITBIT brand by escalating a campaign of deceptive reviews, comments and testimonials that targeted Fitbit.  *See, e.g.* Wakefield Decl. ¶¶ 52-53, Exs. 49-50.  ██████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████  *Id.* ¶ 52, Ex 49.

---

[1]  Fitbug Holdings PLC is the parent corporation of Fitbug Limited.  Wakefield Decl. Ex. 1, at 160:16-161:2.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Just weeks after accusing Fitbit of unfair competition, Mr. Kee expanded this deceptive campaign to target Fitbit media coverage broadly. Park Decl., Ex. 11. ███████████



███████). Plaintiff anticipated that this campaign would result ████████████

████████████ from Fitbit. *Id.*

Fitbug employees adhered to Mr. Kee's directive. *See* Wakefield Decl. ¶ 53, Ex 50

███████████ *Id.*

███████ *See, e.g.*, Wakefield Decl. ¶¶ 2, 54-56, Ex. 2 at 173:6-24, Exs. 51-53.

While Plaintiff saw ███████████████████████. *Id.* at Ex. 7. Meanwhile, Fitbit continued to succeed. In March 4, 2013, TechCrunch reported that Fitbit was raising more than $30 million dollars in capital at a $300 million-plus valuation. *Id.* at 56. Plaintiff filed this lawsuit later that month. Dkt. No. 1.

## III. ARGUMENT

### A. Legal Standard.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the party moving for summary judgment would bear the burden of proof at trial, it has the initial burden of establishing the absence of a genuine issue of fact on each issue material

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   to its claim or defense.  *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006)

2   (affirming summary judgment on laches) ("*Miller I*").  When the moving party meets its burden,

3   the "adverse party may not rest upon the mere allegations or denials of the adverse party's

4   pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule,

5   must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

6       **B.    Laches Bars Plaintiff's Claims.**

7       "Laches is an equitable time limitation on a party's right to bring suit, resting on the

8   maxim that one who seeks the help of a court of equity must not sleep on his rights."  *Jarrow*

9   *Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) (internal citations and

10  quotation marks omitted).  The Ninth Circuit has made clear that laches completely bars not only

11  claims for past damages, but also claims for injunctive relief.  *See Jarrow Formulas*, 304 F. 3d at

12  835, 840.  Laches is a defense to Lanham Act claims and related state law claims.  *Id.*; *Saul*

13  *Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096, 1109 (N.D. Cal. 2008) (granting

14  summary judgment on laches for all Lanham Act claims and California state law causes of

15  action).  The Ninth Circuit has repeatedly affirmed district court orders granting summary

16  judgment on the laches defense for defendants in Lanham Act cases.  *Jarrow Formulas*, 304 F. 3d

17  at 840, *Miller I*, 454 F.3d at 997 (affirming summary judgment on laches); *Tillamook Country*

18  *Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1108-1109 (9th Cir. 2006)

19  (same).  To establish laches, a defendant must show "(1) an unreasonable delay by plaintiff in

20  bringing suit, and (2) prejudice to [it]self."  *Miller I*, 454 F.3d at 997 (affirming summary

21  judgment on laches).

22      Here, the undisputed facts show that Plaintiff delayed unreasonably in bringing suit and

23  that Plaintiff's delay has severely prejudiced Fitbit.

24          **1.    Plaintiff's Delay Was Unreasonable.**

25      "A determination of whether a party exercised unreasonable delay in filing suit consists of

26  two steps."  *Jarrow Formulas*, 304 F.3d at 838.  "First, [a court] assess[es] the length of delay,

27  which is measured from the time the plaintiff knew or should have known about its potential

28  cause of action."  *Id.*  Second, once a court determines the length of delay, the court must "decide

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  whether the plaintiff's delay was unreasonable." *Id.* (citations and internal quotation marks

2  omitted).

3          **a.**      **Plaintiff Delayed Filing Suit for Over Four and Half Years.**

4         In assessing the length of a Plaintiff's delay, courts apply an objective, "knew or should

5  have known," standard in which laches may arise from either actual or constructive knowledge.

6  *Miller 1*, 454 F.3d at 980-981.  Courts judge constructive knowledge from an objective,

7  reasonable person standard; therefore, "a trademark owner is chargeable with the information it

8  might have received had due inquiry been made."  *Saul Zaentz Co*., 627 F. Supp. 2d at 1110-11;

9  citing *Miller 1,* 454 F.3d at 980-981.  "The constructive knowledge standard imposes on a

10  trademark owner the duty to police its rights against potential infringers."  *Id.*; *Grupo Gigante Sa*

11  *De CV v. Dallo & Co. Inc.*, 391 F.3d 1088, 1102 (9th Cir.2004) ("[c]ompanies expecting judicial

12  enforcement of their marks must conduct an effective policing effort"); *E-Systems, Inc. v.*

13  *Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983)( "[p]laintiff ought to have discovered

14  defendant's use sooner had it been diligently seeking to enforce its mark").

15         Here, the undisputed evidence shows that Plaintiff knew or should have known of Fitbit's

16  use of its mark no later than September 10, 2008, after Fitbit publicly announced its original

17  fitness tracker.  At that time, Fitbit began to receive extensive media coverage, and every visitor

18  to Fitbit's website could see the FITBIT mark, learn about Fitbit's product and services, and place

19  an order for a Fitbit product under a prominent button saying "BUY."  Park Decl., ¶ 13, Ex.5.

20  *See Dr. Seuss Enters., L.P. v. Penguin Books USA*, Inc., 109 F.3d 1394, 1396-97 (9th Cir. 1997)

21  (affirming preliminary injunction based on an advertisement for product that defendant had not

22  yet sold).

23         The same day, Plaintiff not only received emails from various sources ███████████

24  ████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████ Wakefield Decl., Exs. 9-15, 17.  Fitbug

26  immediately began investigating Fitbit and ██████████████████████████. *Id.* at

27  Exs. 10, 12-13.  Given Plaintiff's undisputed knowledge of Fitbit and the inquiries that it received

28  from its U.S. customers about Fitbit at the time, Plaintiff, at a minimum, should have known in

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   September 2008 of the conduct that it now challenges in its infringement claims.  *Id.*, Ex. 3 at

2   67:7-68:14, Ex. 13; *see also Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.,* 559

3   F.3d 985, 990-91 (9th Cir. 2009) (laches period begins when a "prudent business person should

4   recognize the likelihood of confusion to consumers"). [2]

5        Indeed, although it said nothing to Fitbit at the time, the undisputed evidence shows that

6   Plaintiff considered bringing claims against Fitbit in 2008.  ███████████████████

7   ████████████████████████████████████████████████████

8   ███████████████████████████████████████████. Wakefield

9   Decl., Ex. 21; Ex. 1 at 90:21-91:14.  Mr. Landau also admitted that in 2008 the similarities

10  between Fitbit and Fitbug were ██████████████████████████████

11  ███████████████████ Wakefield Decl. Ex. 1, at 96:21-98:10.  But at the same time

12  Landau knew that his Chief Marketing Officer had sent Fitbit notes of encouragement proposing

13  that the companies do business together.  *Id.* at Ex. 17.  Despite believing it had potential claims

14  in 2008, Fitbug waited over four years—until March 29, 2013—to file this lawsuit.

15        The undisputed facts thus establish that Plaintiff knew or reasonably should have known

16  of Fitbit's use of its mark in connection with fitness tracking products as of September 10, 2008.

17  It is also undisputed that Plaintiff filed this lawsuit on March 29, 2013, four years and six months

18  later.  *See* Dkt 1.  While Plaintiff may quibble about the scope of its *actual* knowledge, that

19  quibble is insufficient to create a genuine issue of fact as to Plaintiff's *constructive* knowledge in

20  September 2008.  The unchallenged evidence establishes that Plaintiff delayed over four and half

21  years before filing suit.

22

23

24

25  [2]  Plaintiff has identified certain graphic design elements from Fitbit's website that it argues are
    similar to elements of graphics that Plaintiff claims it used, such as a blue dot over the letter "i" in
26  the Fitbit logo, a photograph showing a Fitbit device in a jeans coin pocket, and the use of
    "silhouette" images of people.  Compl., at ¶¶ 18-20.  Plaintiff asserts that these purported
27  similarities, while not infringements themselves, evidence bad faith intent.  Yet these graphic
    design elements were visible on Fitbit's website on the day it launched, and thus Plaintiff had
28  actual or constructive knowledge of them beginning in September 2008.  Park Decl. ¶ 27, Ex. 5.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**b.     Laches Presumptively Bars Plaintiff's Claims Because it Filed Suit Outside the Two-Year Statute of Limitations for an Analogous State-Law Claim.**

Plaintiff's delay of over four and a half years was unreasonable.  Courts consider the reasonableness of plaintiff's delay in light of the time period of the statute of limitations that applies to the most closely analogous state-law claim.  *Jarrow Formulas*, 304 F.3d at 838.  If *any part* of the allegedly wrongful conduct occurred outside of the limitations period, courts presume that laches bars plaintiff's claims.  *Id.* 836-37; *Miller v. Glenn Miller Prods.*, 318 F. Supp. 2d 923, 941 (C.D. Cal. 2004) ("*Miller II*").

Because the Lanham Act does not contain an explicit statute of limitations, courts in the Ninth Circuit presume that Congress intended to "'borrow' the limitations period from the most closely analogous action under state law."  *Jarrow Formulas*, 304 F.3d at 836.  Here, Plaintiff's claims all hinge on allegations of trademark infringement.  The most analogous state law claim to trademark infringement under California law is common law trademark infringement, which, as this brief explains below, is subject to California's two-year statute of limitations for tort claims under California Code of Civil Procedure 339.

Cases within the Ninth Circuit have been inconsistent in identifying the most closely analogous state-law action for Lanham Act claims, and in identifying the relevant statute of limitations.  In several cases, the courts have adopted—without analysis—a limitations period to which the parties had agreed.  *See id.* at 838 (parties agreed to apply three year statute of limitations for fraud); *Miller I*, 454 F.3d at 997 n.11 (applying by party agreement California's four-year catch-all limitation); *Milon-DiGiorgio Enters.*, 559 F.3d at 999 ("Neither party disputes the imputation of the four-year limitations period").  Federal court opinions citing California's four year catch-all limitations period appear to track the Central District's opinion in *Miller II*, which accepted—with no analysis—the parties' agreement that a four year limitations period applied both to the contract claims at issue in that case (Cal. Civ. Proc. Code § 337) and to the trademark infringement claims.[3]  *See* 318 F.Supp.2d at 942; *see also Internet Specialties W., Inc.*

---

[3]  Even if the four-year period did apply, Plaintiff knew or should have known of basis for its claims against Fitbit more than 4-years before filing suit.

*v. ISPWest*, No. CV05-3296FMCAJWX, 2006 WL 4568073, at *1 (C.D. Cal. Nov. 14, 2006) *aff'd sub nom*. 559 F.3d 985 (9th Cir. 2009).

While Fitbit agrees that the state claim most analogous to Plaintiff's claims is common law trademark infringement, Fitbit points out that the *Miller II* court's uncritical application of a four-year catch-all limitations period *overlooked California precedent on a question of California law and was inconsistent with controlling California law and other Ninth Circuit precedent.* Rather, the statute of limitations for common law trademark infringement under California law is two years under California Code of Civil Procedure 339, the limitations period for tort claims.

The Supreme Court of California held in *Mission Imports, Inc. v. Superior Court* that "[a]n action for trademark infringement sounds in tort." 31 Cal. 3d 921, 931 (1982) (*in bank*). Thus, California's two-year limitations period for tort claims (Cal. Civ. Proc. Code § 339) should apply, not the four-year catch-all provision (Cal. Civ. Proc. Code § 343), which applies only when there is *no other* applicable limitations period.[4]  Judge Breyer of this District has agreed. *See High Country Linens, Inc. v. Block*, No. C 01-02180 CRB, 2002 WL 1998272, at *2 n.1 (N.D. Cal. Aug. 20, 2002) ("common law trademark infringement claim is also limited by Cal. Civ. P. Code § 339").  And where the Ninth Circuit has analyzed the statute of limitations for state trademark infringement claims, it has arrived at a similar result.  *See Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 719-720 (9th Cir. 2004) (finding that trademark infringement sounds in tort and applying Montana's general tort statute of limitations to a trademark infringement action under Montana law).

Accordingly, the limitations period for the most analogous state law claim here is two years, and it expired no later than September 10, 2010.  Because Plaintiff filed suit more than two years after the analogous limitations period had run, laches presumptively bars Plaintiff's claim.

---

[4]  California Code of Civil Procedure § 339 imposes a two-year limitations period for any "liability not founded upon an instrument of writing," and courts consider it the catch-all limitations period for tort claims, including for similar business torts, including those that affect reputation and goodwill.. *Murphy v. Hartford Acc. & Indem. Co.*, 177 Cal. App. 2d 539, 544 (1960); see also *Guess, Inc. v. Superior Court*, 176 Cal. App. 3d 473, 479 (1986) (two-year limitations period under § 339 applies to trade libel claims); *Cusano v. Klein*, 264 F.3d 936, 950 (9th Cir. 2001) (violation of right of publicity); 3 Witkin, Cal. Proc. 5th (2008), at § 648.

2.     **Plaintiff Has No Valid Excuse for its Delay.**

Plaintiff cannot overcome the presumption of laches because there can be no genuine dispute of fact that Plaintiff sat on its rights and unreasonably delayed filing suit.  While the Court should consider the reasonableness of Plaintiff's delay in light of the presumption that Plaintiff's claims are barred by laches, it can also consider whether there is a legitimate excuse for delay.  *See Saul Zaentz Co.*, 627 F. Supp. 2d at 1113.

As the facts above make clear, Plaintiff  knew or should have known of its claims in 2008 yet waited over four years to file this lawsuit.  During the period of delay, Plaintiff took no action to enforce its rights and, remarkably, did not oppose or otherwise challenge any of the six FITBIT-formative applications for trademark registration that Fitbit filed.[5]  Park Decl. ¶ 54; Wakefield Decl., Ex. 1, at 47:21-25.[6]  Here, Plaintiff has no justifiable excuse for its delay in filing suit.

a.     **The Doctrine of Progressive Encroachment Does Not Apply.**

Plaintiff will likely argue that the doctrine of progressive encroachment excuses its delay.  Under the doctrine of progressive encroachment, a trademark owner need not sue in the face of *de minimis* infringement and may wait until the junior user of a mark moves into direct competition.  *See Tillamook*, 465 F.3d at 1110.  Here, Plaintiff contends that it was primarily selling to business customers—corporate customers and insurers who would provide fitness tracking products to company employees (for example as part of "corporate wellness" programs).  Plaintiff has vainly suggested that Fitbit initially offered its products and services only in the direct to consumer (or "B2C") channel and only recently expanded into the business to business (or "B2B") market.  This argument fails for at least three reasons.

*First*, undisputed evidence contradicts this argument.  Beginning in September 2008, Fitbit trackers were available for order on Fitbit's website to any person or business that wished

---

[5] The United States Patent and Trademark Offices registered each of these marks and cited no conflict with Plaintiff's existing registrations for FITBUG.

[6] Plaintiff has likewise failed to attempt to enforce its rights against other fitness tracking products using "fit" or "bug" names, which include the Adidas Fit Smart, the Garmin Vivofit, the Misfit Shine, and the Samsung Gear Fit, Bodybugg and Stay-fit Bug personal training service. Wakefield Decl, Ex. 1, at 47:21-25; Park Decl. ¶ 43, Exs. 18-21.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

to purchase them.  Park Decl. ¶¶ 13-14.  Indeed, Fitbit immediately received interest and inquiries from both consumers and potential business customers, and began selling products to business customers shortly after it first began shipping products.  *Id.* at 28; McDonough Decl. at ¶ 5. Some of the same business customers considering Plaintiff also contacted and worked with Fitbit. *See, e.g.,* Wakefield Decl. Ex. 1, 119:4-19; 121:17-20.  Plaintiff's internal emails repeatedly identified Fitbit as a "competitor" as early as September 10, 2008.  *Id.* Exs. 9, 11.  Beginning as early as February 2009, Fitbit and Fitbug jointly participated in a B2B project that Oracle coordinated, which included several communications involving the CEOs of both companies. Park Decl. ¶¶ 23-25, Exs. 9-10 .  And in another example from 2009, Plaintiff's internal records state it was "competing against Fitbit" for a business customer.  Wakefield Decl. Ex. 29 at 4. Thus, not only was Fitbit marketing itself in the B2B space from the beginning, but Plaintiff also had actual or constructive knowledge of this fact.

*Second*, Plaintiff's effort to differentiate B2B and B2C sales is immaterial because Plaintiff has not confined its infringement claims to B2B sales, and Plaintiff asserts that it always sold directly to consumers, not just businesses.  Indeed, the undisputed evidence shows that in 2008 and 2009 Plaintiff's sales were ███████████████████  Wakefield Decl. ¶¶ 5, 9, Ex. 4, at Interrogatory No. 18, Ex. 8.  Moreover, Fitbit's use of its mark in 2008 was anything but *de minimis*.  *Saul Zaentz Co.*, 627 F. Supp. 3d at 1115 (rejecting progressive encroachment theory where defendant's early use, albeit comparatively small, was not *de minimis*).  Fitbit was prominently using its mark for all of its goods and services, and it received national and international media attention.  Park Decl., ¶¶ 12-13, 34.  Given that the parties were both selling directly to consumers and businesses from the inception of Fitbit's business, the doctrine of progressive encroachment cannot apply here.

*Third*, any increase in Fitbit's marketing and sales efforts targeting the B2B market, and concomitant increase in B2B sales from 2008 levels, was normal business growth and cannot give rise to progressive encroachment.  *Tillamook*, 465 F.3d at 1110.  In *Tillamook*, the Ninth Circuit affirmed summary judgment on laches.  It held that, to establish progressive encroachment, a plaintiff must show that the junior user expanded "its business into *different* regions or into

FITBIT'S NOTICE OF MOTION AND MPA          14          CASE NO. 13-cv-01418-SC
ISO MSJ

*different* markets." *Id.* (emphasis in original).  The Court noted that "[a] junior user's growth of its existing business and the concomitant increase in its use of the mark do not constitute progressive encroachment."  *Id.*  Here, Plaintiff contends that "[i]n late 2011 . . . Fitbit may have been beginning to place an emphasis on selling via B2B routes to market."  Wakefield Decl., Ex. 4, at Interrogatory No. 18.  While it is true that Fitbit's B2B sales increased in 2011, that increase is consistent with the overall growth of Fitbit's business, which saw its ███████████████ ███████████████████████, in both consumer and corporate sales.  Park Decl. ¶ 37.

### b.    Plaintiff's Belated Cease-and-Desist Letter Does Not Negate Plaintiff's Delay.

Similarly, any argument that the laches clock stopped when Plaintiff sent Fitbit a letter on December 9, 2011, also fails.  *See* Park Decl., Ex. 11.  Fitbit promptly responded to Plaintiff's complaints of trademark and copyright infringement, and it explained in two separate letters that Fitbit's use of its mark was not infringing.  Fitbit also pointed out at that time that laches *already* barred Plaintiff's claims, because by then it had waited over three years to complain about Fitbit's name.  *Id.* at Ex. 12.  After Fitbit explicitly rejected Plaintiff's claims, and even after Fitbit pointed out then that Plaintiff's claims were time-barred, Plaintiff did *absolutely nothing* to enforce its rights in the FITBUG mark for an additional fifteen months.  *Id.* at 12-15; Dkt. No. 1.

At the time Plaintiff sent its cease-and-desist letter, laches already presumptively barred Plaintiff's stale claims.  Even if it did not already bar the claims, courts in this Circuit have held that cease and desist letters do not toll the period of laches where the allegedly infringing party promptly denies the allegations.  *See Danjaq L.L.C. v. Sony Corp.*, 263 F.3d 942, 949, 953 (9th Cir. 2001) (telegrams to predecessor of defendant and its law firm alleging infringement of rights did not stop the clock on laches); *Matsunoki Grp., Inc. v. Timberwork Oregon, Inc.*, No. C 08-04078 CW, 2011 WL 940218, at *5 (N.D. Cal. Feb. 18, 2011) (cease and desist letter did not stop laches period where defendant responded and asserted ownership of the trademarks); *FLIR Sys., Inc. v. Sierra Media, Inc.*, 965 F.Supp.2d 1184, 1210 (D. Or. 2013) (counter-plaintiff unreasonably delayed bringing suit despite sending two cease-and-desist letters).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

By refuting Plaintiff's allegations, Fitbit put Plaintiff on notice that it had a good faith belief that it had rights to use its name.  *See Groupion, L.L.C. v. Groupon, Inc.*, 826 F.Supp.2d 1156, 1165 (N.D. Cal. 2011) (continued use of mark after receipt of cease and desist letter not indicative of bad faith).  Once Plaintiff had notice of Fitbit's position, Plaintiff's further delay amplified the potential prejudice to Fitbit.  "Plaintiff cannot simply wait without explanation to see how successful the defendant's business will be and then ask for an injunction to take away good will developed by defendant in the interim."  *Grupo Gigante*, 391 F.3d at 1102-03.  It would be unjust to allow Plaintiff to take advantage of a further fifteen-month delay simply because it sent a letter it did not promptly pursue.  Here, in the very opposite of a typical trademark case, the Plaintiff's evident strategy was to sit back while Fitbit grew, so that *Plaintiff* could reap what *Fitbit* had sown during the years of delay.  In the circumstances of this case, the letter has no legal effect other than to reinforce the fact that Plaintiff continued to sit on its hands.

### c.   The E-Systems Factors Compel a Finding that Plaintiff's Delay Was Unreasonable.

In addition to examination of the analogous limitations period and consideration of whether Plaintiff had a valid excuse for its delay, the Ninth Circuit has directed courts to consider additional factors in determining whether plaintiff's delay was "unreasonable and, therefore, barred: '(1) strength and value of the trademark rights asserted (2) plaintiff's diligence in enforcing [its] mark; (3) harm to senior user if relief is denied; (4) good faith ignorance by junior user; (5) competition between senior and junior users; and (6) extent of harm suffered by the junior user because of senior user's delay.'"  *Tillamook*, 465 F.3d at 1108 (quoting *E-Systems*, 720 F.2d at 607).  Courts have discretion to weigh these factors in light of the facts and to balance the interests and equities of the parties.  *Tillamook*, 465 F.3d at 1110-1111.

This brief addressed the second *E-Systems* factor (Plaintiff's lack of diligence) in Sections III.B.1 and 2, above and addresses the sixth *E-Systems* factor (harm to Fitbit) in Section III.B.3, below.  The remaining factors favor Fitbit as well.

First, Plaintiff's mark is inherently weak, in view of Plaintiff's low sales and minimal investment.  At the time of Fitbit's launch in September 2008 ███████████

Fᴇɴᴡɪᴄᴋ & Wᴇsᴛ LLP
Aᴛᴛᴏʀɴᴇʏs ᴀᴛ Lᴀᴡ
Sᴀɴ Fʀᴀɴᴄɪsᴄᴏ

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ *Id.* at

Ex. 1, at 256:12-15.  While Plaintiff's █████████████████████████████

████████████████████.  *See id.* at Exs. 7, 57.  Plaintiff's own expert, Dr. Bruce Isaacson,

█████████████████████████████████████████  Wakefield Decl. Ex. 6 at p. 7.[7]  In

contrast, the Fitbit mark is highly valuable given Fitbit's rapid and continuing growth.  *E-Systems*,

720 F.2d at 607 (noting that defendant's mark was "unquestionably" valuable given its rapid and

continued growth, making it inequitable to force Defendant to abandon its name).

Second, Fitbit adopted and used its mark in good-faith ignorance of Plaintiff's mark.  The

undisputed evidence shows that Defendant selected the FITBIT mark before it had ever heard of

Plaintiff.  Park Decl. ¶ 3-6, Exs. 1-2.  While Fitbit later learned of Plaintiff, it had no reason to

believe that Plaintiff had any objection to its mark.  Indeed, when Fitbit launched, it received

repeated communications from Plaintiff that complimented  Fitbit's efforts and expressed an

interest in selling Fitbit products to Plaintiff's subscribers, thus conveying Plaintiff's tacit

approval of the Fitbit name.  Fitbit's good-faith belief that it was entitled to use the FITBIT mark

received a governmental endorsement when the U.S. Patent and Trademark Office registered

FITBIT, finding no conflict with Plaintiff's registered mark.  *See id.* at ¶¶ 47, 55, Exs. 32, 39.

Finally, although the parties compete, courts have found that the laches defense applies

despite competition between the parties.  *E-Systems*, 720 F. 2d at 607.   If anything, the existence

of competition supports a finding that Plaintiff's delay was unreasonable, because competition

should make it easier for a plaintiff to identify any *legitimate* claims and should make it urgent to

address them.

---

[7] Given the inherent weakness of Plaintiff's mark, it is not surprising that Fitbit's likelihood of
confusion survey showed zero confusion.  *Id.* at Ex. 5 at p.3 ("none of the 279 survey
respondents seeing Fitbit product mentioned 'Fitbug' or a Fitbug brand").  It is equally
unsurprising that Plaintiff failed to produce *any* survey in this case.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**3.      Fitbit Will Suffer Severe Prejudice as a Result of Plaintiff's Delay.**

Fitbit will suffer severe prejudice if Plaintiff pursues, or recovers on, its claims after such a lengthy delay.  One of the chief forms of prejudice that courts consider in assessing laches is expectations-based prejudice.  *See Danjaq LLC*, 263 F.3d at 955.  Expectations-based prejudice derives from a defendant's taking actions or suffering consequences that it would not have, had the plaintiff brought suit promptly.  *Id.*  For example, a defendant suffers prejudice if, in reliance on plaintiff's delay, it invests labor and capital to build a trademark's goodwill and future value. *Saul Zaentz Co.*, 627 F. Supp. 2d at 1117.  "[A] defendant can make the required showing of prejudice by proving that it has continued to build a valuable business around its trademark during the time that the plaintiff delayed the exercise of its legal rights."  *Grupo Gigante*, 391 F.3d at 1105.  Similarly, a defendant may establish prejudice by showing that during the delay "it invested money to expand its business or entered into business transactions based on his presumed rights."  *Miller I*, 454 F.3d at 999.

The undisputed evidence shows that, during Plaintiff's delay, Fitbit made a massive investment of creativity, time and money to build a company from virtually nothing to the leading company in its industry.  After Plaintiff first contacted Fitbit to discuss a possible business relationship, Fitbit's U.S. revenue grew from ███████████████████████████████████. Park Decl. ¶ 37.  Along with its growth in sales, Fitbit also invested heavily in its workforce— growing from █████████████████████████████████████ ██████████████████.  Park Decl. ¶ 38, Ex. 16.  Fitbit also invested heavily in marketing the FITBIT name and mark, having spent over ██████████████ in advertising and marketing through September 13, 2013.  Park Decl. ¶ 39, Ex. 17.  Fitbit has also spent ████████████████ dollars researching and developing new products and features that it offers under the FITBIT mark.  *Id.*

As a result of its investment in the business, products, and brand, Fitbit has developed tremendous goodwill and has gained wide recognition as the leading company and brand in its market.  *Id.* at ¶¶ 36, 44.  Fitbit has received numerous awards and honors for its innovative and well respected products.  Most recently, Fitbit has earned a "Best Buy" rating by Consumer

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Reports, gained recognition as the world's most innovative company in fitness by Fast Company, and received the Men's Journal "Gear of the Year Award 2014." *Id.* at ¶ 36. Fitbit also receives widespread media coverage from major publications and television networks such as CNN, People, ABC News, CBS, The New York Times, the Chicago Tribune, Forbes, TIME, Vogue, the New Yorker and many more. *Id.* at ¶¶ 44-45, Exs. 22-31. Because FITBIT is Defendant's house mark and Defendant uses it in connection with all products and services, an order requiring it to jettison that mark would devastate the company, its investors, and its hundreds of employees.

If Plaintiff had brought suit or even objected to Fitbit's use of its name in 2008, instead of sending emails of encouragement, Fitbit could have sought resolution of this issue before it ever shipped a product. Instead, Plaintiff seeks an injunction that will destroy the tremendous goodwill that Fitbit has built up in its house mark over the years. Park Decl. ¶¶ 56-58. Moreover, after silently watching Fitbit become a success, Fitbug now seeks to profit from Fitbit's hard work by claiming damages that were entirely avoidable if Plaintiff had timely objected.

Because the undisputed evidence shows that Fitbit will suffer prejudice as a result of Plaintiff's unreasonable delay, the doctrine of laches bars Plaintiff's claims and the Court should grant Fitbit summary judgment.

### C.    Fitbug Acquiesced in Fitbit's Use of the FITBIT Mark, Barring its Claims.

As this brief explained above, when Plaintiff first became aware of Fitbit in September 2008, far from expressing concern to Fitbit about use of the FITBIT mark, Plaintiff's early and repeated communications to Fitbit reflected something quite different: unfettered enthusiasm and praise for Fitbit's product and an interest in pursuing a collaborative business relationship. Plaintiff's active encouragement of Fitbit's business combined with Plaintiff's inexcusable delay and the resulting prejudice to Fitbit, constitute acquiescence in Defendant's use of FITBIT.

The doctrine of acquiescence "limits a party's right to bring suit following an *affirmative* act by word or deed by the party that conveys implied consent to another." *Seller Agency Council, Inc. v. Kennedy Center for Real Estate Educ., Inc.*, 621 F.3d 981, 988 (9th Cir. 2010) (emphasis in original) ("*Seller Agency I*"). Consequently, a defendant asserting that a plaintiff acquiesced to defendant's use of its mark must show that "(1) the senior user actively represented

that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Id.* at 989. "Active consent is implied by conduct on the plaintiff's part that amounts to an assurance to the defendant, *express or implied*, that the plaintiff would not assert his trademark rights against the defendant." *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ ., Inc.*, No. SA CV 06-679 AHS, 2011 WL 1211477, at *6 (C.D. Cal. Mar. 30, 2011) ("*Seller Agency II*").[8]

The Ninth Circuit in *Seller Agency I* considered as a matter of first impression the applicability of the doctrine of acquiescence and adopted the Eleventh Circuit's test for acquiescence. *Seller I*, 621 F.2d at 989 *citing Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1558 (11th Cir.1991). The Eleventh Circuit has observed that an active representation does not require specific endorsement or formal agreement: "*implied acquiescence may be inferred from a clear encouragement* of the use of the allegedly infringing mark " *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1348 (11th Cir. 1996) (Birch, J., concurring) (emphasis added). Thus, a plaintiff's acquiescence can be express or implied in conduct. *See Seller Agency II*, 2011 WL 1211477, at *6. Courts in other circuits agree. *See Ambrosia Chocolate Co. v. Ambrosia Cake Bakery*, 165 F.2d 693, 694-695 (4th Cir. 1947) (plaintiff's claims were barred by laches and acquiescence where plaintiff had approached the defendant "evinc[ing] interest" in a business relationship).

When Fitbit announced its first fitness tracker on September 9, 2008, at the TechCrunch 50 conference, Fitbug's Chief Marketing Officer, Dennis Skigen, took immediate interest and left

---

[8] Though the court in *Seller Agency II* ultimately ruled that defendants/counterclaimants' could not prevail on an acquiescence defense on the facts there, this case is very different. Unlike in *Seller Agency II*, where defendants made ambiguous representations to plaintiff in the face of ongoing litigation, here, Mr. Skigen's unambiguous statements of praise and approval of Fitbit's business and desire for a business collaboration remained Plaintiff's sole communication to Fitbit for over three years. *See Seller Agency II*, 2011 WL 1211477, at *6-7. Consequently, after receiving Mr. Skigen's emails and telephone calls, Fitbit reasonably inferred that Fitbug took no issue with the FITBIT mark and proceeded to build that brand. Park Decl. ¶ 19.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   both emails and voicemails attempting to reach Fitbit's founders.  Park Decl. ¶¶ 15-18, Exs. 6-8.[9]

2   Mr. Skigen, a senior executive of Fitbug by all appearances, complimented Fitbit and its product

3   and told the Fitbit founders that ████████████████████████ *Id.* at Ex. 8.

4   Moreover, Mr. Skigen e█████████████████████████████████████████

5   ████████████████  ██████████████████████████████████████████

6   ████████████████████████." *Id.*

7        Plaintiff's attempts to contact Defendant to discuss a collaborative relationship are

8   affirmative acts that suffice to establish acquiescence here.  Moreover, from Fitbit's perspective,

9   Plaintiff's offer to sell Fitbit products to Plaintiff's members conveyed approval of, and implied

10  consent to, Fitbit's business activities.

11       Although Fitbit was not interested in working with Plaintiff, it nevertheless reasonably

12  relied upon Plaintiff's implied representation that it had no objection to the Fitbit name and mark.

13  Park Decl. ¶ 19.  Plaintiff cannot now erase its early encouraging representations in the newfound

14  hope of capitalizing on the commercial success and goodwill of the Fitbit brand.  "A plaintiff

15  cannot indicate at one time to defendant that defendant's acts are acceptable and then later sue

16  defendant after it has acted in reliance on plaintiff's implied assurances."  6 McCarthy on

17  Trademarks and Unfair Competition § 31:42 (4th ed.).

18

19  [9]   While Plaintiff tries to avoid the consequences of that communication by contending that

20  Mr. Skigen had no actual authority to enter into a business agreement with Fitbit on behalf of
    Fitbug, there can be no genuine dispute of fact that Mr. Skigen had ostensible or apparent

21  authority.  "An agency is ostensible when the principal intentionally, or by want of ordinary care,
    causes a third person to believe another to be his agent who is not really employed by him." Cal.

22  Civ. Code § 2300.  At the time, Fitbug had authorized Mr. Skigen to use of the title of Chief
    Marketing Officer ("CMO"), intending that third parties would recognize him as its CMO and

23  that the title would "provide a degree of gravitas when developing sales leads," and could help
    "open doors."  Wakefield Decl. ¶ 2, Ex. 1, at 27:24-28:22; Park Decl. ¶ 17-19, Ex. 8.  *See Holt v.*

24  *Kormann*, No. SACV 11-1047 DOC MLG, 2012 WL 2150070, at *5-7 (C.D. Cal. June 12, 2012)
    (plaintiff reasonably believed that the agent was authorized to act on behalf of the defendant

25  where the defendant permitted its agent to use its name and logo, and listed its agent's contact
    information on its website and advertisements).  Furthermore, no one at Fitbug ever contradicted

26  or revoked Mr. Skigen's authority to send those emails, despite the fact that Mr. Skigen blind

27  copied Mr. Landau on at least one communication with Fitbit and regularly reported his activities

28  to Mr. Landau.  Wakefield Decl. ¶ 19, Ex. 17; *see e.g. id.* Exs. 9, 12-13, 18.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   The undisputed facts overwhelmingly establish that Plaintiff's early communications to

2   Fitbit, at the exact time that Fitbit was publicly launching its brand and beginning a long series of

3   investments to build it, conveyed approval and implicit consent to the business and brand that

4   Fitbit was building.  That establishes acquiescence as a matter of law and further justifies

5   summary judgment for Fitbit.

6   **IV.    CONCLUSION**

7   Trademark law prevents companies from getting a free ride on the success of others.

8   Although Plaintiff accuses Fitbit of infringement, it is Plaintiff who seeks to profit from Fitbit's

9   hard work and innovation.  After waiting until Fitbit had emerged as the leading company in the

10  industry, Plaintiff wants to take all of the benefit of Fitbit's hard work.  Moreover, the evidence

11  shows that Plaintiff itself impliedly consented to the Fitbit name, and then traded on Fitbit's name

12  and reputation for years, linking its own activities and products to those of Fitbit.  In these

13  circumstances, the doctrines of laches and acquiescence bar Plaintiff's claims.  The Court should

14  grant Fitbit's motion and enter summary judgment in its favor.

15  Dated:   November 7, 2014                    FENWICK & WEST LLP

16

17                                              By: /s/ *Jedediah Wakefield*
                                                    Andrew P. Bridges
18                                                  Jedediah Wakefield
                                                    Sean S. Wikner
19

20                                              Attorneys for Defendant and Counter-Claimant
                                                FITBIT, INC.

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO