IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| FITBUG LIMITED,<br><br>            Plaintiff,<br><br>     v.<br><br>FITBIT, INC.,<br><br>            Defendant.<br> | )  Case No. 13-1418 SC<br>)<br>)  ORDER ON MOTIONS FOR SUMMARY<br>)  JUDGMENT<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

I.   **INTRODUCTION**

Now before the Court are two motions for summary judgment in this trademark infringement and unfair competition case.  First, Plaintiff Fitbug Ltd. ("Fitbug") seeks partial summary judgment on likelihood of confusion; Defendant Fitbit, Inc.'s ("Fitbit") affirmative defense of laches; and Fitbit's fifth and sixth counterclaims.  ECF No. 47-3 ("Fitbug Mot.").  Second, Fitbit moves for summary judgment on two affirmative defenses: laches and acquiescence.  ECF No. 50 ("Fitbit Mot.").  Both motions are fully briefed,[1] and appropriate resolution without oral argument under

---

[1] ECF Nos. 61-3 ("Fitbit Opp'n"); 65-3 ("Fitbug Opp'n"); 71-3 ("Fitbit Reply"); 74 ("Fitbug Reply").

**United States District Court**
For the Northern District of California

1  Civil Local Rule 7-1(b).  Relatedly, Fitbit has filed an objection

2  to reply evidence under Civil Local Rule 7-11(b) or, in the

3  alternative, a motion to file supplemental briefing.  ECF No. 81

4  ("Fitbit Obj.").  Fitbug opposes that request.  ECF No. 83.  For

5  the reasons set forth below, Fitbug's motion for summary judgment

6  is GRANTED IN PART and DENIED IN PART.  Fitbit's motion for summary

7  judgment is GRANTED.  Fitbit's objection to reply evidence is

8  DENIED, but the alternative motion for leave to file supplemental

9  briefing is GRANTED.

10

11 **II.   BACKGROUND**

12      Fitbit and Fitbug both produce portable electronic fitness

13 tracking devices.  These devices are wearable, and collect data

14 about a user's steps walked, calories burned, activity intensity,

15 sleep, and other health and fitness metrics.  Portable electronic

16 fitness tracking devices also connect to the internet or a user's

17 computer or smartphone, and, in conjunction with an application or

18 website, allow the user to view and analyze the data collected, set

19 or track fitness goals, and collect other information relevant to

20 the user's health and fitness plans.

21      Fitbug owns two federal trademark registrations, and Fitbit

22 also owns a federal trademark registration.

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

**United States District Court**
For the Northern District of California

There have been several variations of the parties' logos throughout their history, but the relevant logos are:

Fitbug's original designs:                    Fitbit's original design:

   



Fitbug's current design:                      Fitbit's current design:

                          

    Fitbug, headquartered in the United Kingdom and founded in 2004, was one of the first companies to enter the portable electronic fitness tracker market.  Since that time, Fitbug has made both sales directly consumers ("business-to-consumer" sales), and so-called "business-to-business-to-consumer" sales of its products.  Business-to-business-to-consumer sales include sales to health insurance plans, corporate wellness programs, and other programs, and generally involve incentives like bulk discounts as well as special tools for tracking group fitness goals or running fitness competitions.  Initially, Fitbug focused on the British market, but in 2005 it sought to sell its products in the United States as well.  Since that time, however, Fitbug's success in the

United States market has been limited.

Fitbit, headquartered in San Francisco, is one of the leading providers of portable electronic fitness trackers.  James Park and Eric Friedman founded the company in March 2007.  Fitbit's name was chosen after a poll on Facebook, and at the time the name was chosen, as far as Park is aware, nobody at Fitbit was aware of Fitbug's existence.  ECF No. 46-5 ("Park Decl.") ¶¶ 4-6.  However, by December 2007, prior to the launch of Fitbit's website or the sale of its first products, Friedman sent Park a link to the Fitbug website, although Park contends that he thought little of the link at the time.  Id. ¶ 7.

Fitbit first announced its products on September 9, 2008.  By the next day, Fitbit's website featured information regarding its first device, the Fitbit Classic, as well as a link for businesses or individuals to place orders for the devices.  Id. ¶ 13; Ex. 5.  Nonetheless, Fitbit did not begin shipping its products until September 2009, and early on, only a small amount of Fitbit's sales were in the business-to-business-to-consumer category.  However, over time Fitbit's sales grew substantially both in general and in the business-to-business-to-consumer market.

The day Fitbit announced its product, Fitbug received several emails and other contacts stating that Fitbit was entering the portable electronic fitness tracking device market.  Additionally, a representative of Fitbug sought (unsuccessfully) to contact Fitbit to explore a potential business partnership.  Over the next weeks and months, internal communications show that Fitbug was concerned about potential competition from Fitbit, and was contemplating various responses including sending a cease and

1   desist letter.  See ECF No. 46 ("Wakefield Decl.") Exs. 17-23.

2   Nevertheless, Fitbug did not assert any violation of its trademark

3   rights at that time.  Instead, Fitbug first assert infringement of

4   its rights by Fitbit in a December 2011 letter.  Park Decl. at ¶

5   26; Ex. 11.  Fitbit denied infringement, and subsequent letters

6   failed to resolve the dispute.  Id.

7       Fitbug filed suit on March 29, 2013 alleging trademark

8   infringement under 15 U.S.C. Section 1114(1), unfair competition

9   under 15 U.S.C. Section 1125(a), common law trademark infringement

10  and unfair competition, violations of the California Business and

11  Professions Code Section 17200, and seeking cancellation of

12  Fitbit's trademark registration.  See ECF No. 1 ("Compl.").  Fitbit

13  counterclaimed, alleging unfair competition and false or misleading

14  advertising under California law.  ECF No. 43 ("Am. Answer &

15  Counter-Cls.") at ¶¶ 189-255.

16      Now, both parties have filed motions for summary judgment

17  seeking to resolve significant portions of these claims.  The

18  matter is currently set for trial beginning on February 9, 2015.

19

20  **III. LEGAL STANDARD**

21      Entry of summary judgment is proper "if the movant shows that

22  there is no genuine dispute as to any material fact and the movant

23  is entitled to judgment as a matter of law." Fed. R. Civ. P.

24  56(a).  Summary judgment should be granted if the evidence would

25  require a directed verdict for the moving party.  Anderson v.

26  Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).  The moving party

27  bears the initial burdens of production and persuasion.  Nissan

28  Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099,

1   1102 (9th Cir. 2000).

2

3   **IV.   <u>DISCUSSION</u>**

4       Fitbug moves for summary judgment on three issues.  First,

5   Fitbug believes the Court should find as a matter of law that they

6   have demonstrated a likelihood of confusion among consumers.

7   Second, Fitbug argues that laches do not bar its claims.  Finally,

8   Fitbug seeks summary judgment on Fitbit's unfair competition and

9   false advertising claims on the grounds that that Fitbit lacks

10  statutory standing to bring those claims.

11      Fitbit opposes these arguments and moves for summary judgment

12  in its own right arguing that Fitbug's claims are barred by laches,

13  and, in any event, Fitbug's claims are barred by its acquiescence

14  to Fitbit's use of the Fitbit mark.  Because the Court finds that

15  Fitbug's claims are barred by laches, the Court need only address

16  that issue and Fitbit's unfair competition and false advertising

17  claims.

18      **A.   <u>Laches</u>**

19      Fitbit's primary argument is that Fitbug's claims are barred

20  by laches.  "Laches is an equitable time limitation on a party's

21  right to bring suit, resting on the maxim that one who seeks the

22  help of a court of equity must not sleep on his rights."  <u>Jarrow</u>

23  <u>Formulas, Inc. v. Nutrition Now, Inc.</u>, 304 F.3d 829, 835 (9th Cir.

24  2002) (internal citations and quotation marks omitted).  Laches is

25  a defense to both Lanham Act claims (including trademark

26  infringement and unfair competition) as well as to California state

27  law claims.  <u>Id.</u>; <u>Saul Zaentz Co. v. Wozniak Travel, Inc.</u>, 627 F.

28  Supp. 2d 1096, 1109 (N.D. Cal. 2008); <u>see also</u>

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  <u>Bridgestone/Firestone Research, Inc. v. Auto. Club De L'Ouest De La</u>
2  <u>France</u>, 245 F.3d 1359, 1362, 1364 (Fed. Cir. 2001) (holding that a
3  petition for cancellation of registered trademark was barred by
4  laches).  A claim is only barred by laches if the defendant can
5  show "(1) unreasonable delay by plaintiff in bringing suit, and (2)
6  prejudice . . . ." <u>Miller v. Glenn Miller Prods., Inc.</u>, 454 F.3d
7  975, 997 (9th Cir. 2006) (citing <u>Couveau v. Am. Airlines, Inc.</u>, 218
8  F.3d 1078 (9th Cir. 2000)).

9       Two issues determine whether a delay was unreasonable.  "First
10  [a court] assess[es] the length of delay, which is measured from
11  the time the plaintiff knew or should have known about its
12  potential cause of action." <u>Jarrow</u>, 304 F.3d at 838.  Next, the
13  Court must "decide whether the plaintiff's delay was unreasonable."
14  <u>Id.</u>  The Court will address each in turn.

15       First, the Court must determine when Fitbug "knew or should
16  have known about its potential cause of action." <u>Id.</u>  This
17  standard can be satisfied by either actual or constructive
18  knowledge, because "[c]ompanies expecting judicial enforcement of
19  their marks must conduct an effective policing effort." <u>Grupo</u>
20  <u>Gigante Sa De CV v. Dallo & Co. Inc.</u>, 391 F.3d 1088, 1102 (9th Cir.
21  2004) (emphasis omitted).  Nonetheless, a trademark holder is "'not
22  required to constantly monitor every nook and cranny of the entire
23  nation and to fire both barrels of [its] shotgun instantly upon
24  spotting a possible infringer.'" <u>adidas Am., Inc. v. Kmart Corp.</u>,
25  No. CV-05-120-ST, 2006 WL 2044857, at *8 (D. Or. June 15, 2006)
26  (quoting <u>Cullman Ventures, Inc. v. Columbian Art Works, Inc.</u>, 717
27  F. Supp. 96, 127 (S.D.N.Y. 1989)).

28       The undisputed facts are as follows.  Fitbit announced its

**United States District Court**
For the Northern District of California

1    products on September 9, 2008 and began receiving significant media

2    coverage.  Park Decl. ¶ 10.  By the next day, Fitbit's website was

3    active and visitors to the site could see Fitbit's trademark, learn

4    about its products, and place an order for the original Fitbit

5    device.  Id. ¶ 13, Ex. 5.  Beginning that day and continuing for

6    some time after, individuals within and outside the Fitbug

7    organization contacted Fitbug to point out Fitbit's entry in the

8    market.  Those emails refer to Fitbit as, among other things,

9    "[a]nother competitor," suggest aspects of Fitbit's user interface

10   are a "total ripoff," and note that while Fitbit's entry into the

11   market is "[n]othing to panic about, . . . [Fitbit] will become an

12   issue and I'd rather be one step ahead."  Wakefield Decl. Exs. 9-

13   17.  In reference to Fitbit's announced products and user

14   interface, a consultant wrote to Paul Landau, Fitbug's CEO, that

15   Fitbit "appears to be doing what Fitbug does but slightly

16   more . . ." and noting that Fitbit "appear[s] to only be available

17   in the US."  Id. Ex. 14.

18       Over the next several months, Fitbug explored several

19   potential responses to Fitbit.  First, beginning two days after

20   Fitbit announced its products, Fitbug's Chief Marketing Officer

21   ("CMO") (unsuccessfully) attempted to contact Fitbit to discuss

22   potential partnerships.  Id. Exs. 17, 20.  Then, on October 14, in

23   an email conversation with the CMO, an attorney said, "I was

24   wondering if they were infringing on your IP -- sounds like some

25   improvements on your idea, but pretty close to [F]itbug including

26   the name."  Id. Ex. 19.  A month later a Fitbug employee wrote to

27   Landau "to remind [him] of Fitbit" because he was "thinking of

28   sending them a cease and desist."  Id. Ex. 21.  Around the same

**United States District Court**
For the Northern District of California

1   time, Landau referred to Fitbit as "thieving bastards[.]" <u>Id.</u> Ex.

2   23.

3      Nevertheless, Fitbit did not begin shipping its products to

4   consumers until September 2009. After that point, Fitbug received

5   several further emails regarding Fitbit's activities. For

6   instance, another lawyer contacted Fitbug's CMO to point out that

7   Fitbit "could cause confusion in the classic trademark sense." <u>Id.</u>

8   Ex. 31.

9      That statement -- that Fitbit's mark could cause consumer

10  confusion -- is the crucial issue for determining when Fitbit knew

11  or should have known of its potential cause of action. "The

12  essence of . . . a [trademark infringement] claim centers on the

13  likelihood of confusion between two marks or products." <u>Internet</u>

14  <u>Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.</u>, 559 F.3d

15  985, 990 (9th Cir. 2009). As a result, when we ask whether Fitbug

16  or another trademark owner "knew or should have known" of its

17  potential cause of action, what we are really asking is when the

18  mark holder "knew or should have known about the likelihood of

19  confusion between" the marks. <u>Id.</u>

20     The Ninth Circuit's answer to this question in <u>Internet</u>

21  <u>Specialties</u> is instructive. In that case, the parties were

22  internet service providers with similar names ("ISWest.com" and

23  "ISPWest.com"). <u>Id.</u> at 988. ISWest became aware of ISPWest's

24  existence shortly after ISPWest registered its domain name in late

25  1998. <u>Id.</u> At that time, the two companies offered somewhat

26  different services -- ISWest offered dial-up and high-speed access

27  nationwide, while ISPWest initially provided only dial-up access in

28  Southern California. <u>Id.</u> According to ISWest's CEO, the company

1   was not concerned about ISPWest at the time (even though they were

2   aware of its existence) because ISPWest did not offer high speed

3   internet and because the highly volatile internet startup market

4   meant that ISPWest might well go out of business.  Id.  Instead,

5   ISWest waited to file suit alleging trademark infringement until

6   2005, after ISPWest had expanded into a provider of nationwide,

7   high-speed internet access.  Id.  Despite this gradual expansion

8   into the high speed internet market, the Ninth Circuit found that

9   the laches period started in 1998.  The court noted that even

10  though ISPWest "did not offer DSL in 1998, both companies did offer

11  internet access, e-mail, and web hosting in the same geographic

12  area under remarkably similar names," and thus "[a] prudent

13  business person should recognize the likelihood of confusion to

14  consumers under such circumstances . . . ."  Id. at 990-91.

15       In this case, the Court finds that Fitbug knew or should have

16  known of the likelihood of confusion by, at the latest, September

17  2008, after Fitbit's launch.  While Fitbit was not yet shipping its

18  products, at that time, Fitbit was selling similar devices "in the

19  same geographic area under [a] remarkably similar name[] . . . ."

20  Id. at 990.  As a result, a prudent business person should have

21  recognized the likelihood of confusion at that point.  See id.

22       Fitbug argues essentially for a per se rule that the laches

23  period can never run "prior to the defendant's actual sale of its

24  goods or services."  Fitbug Opp'n at 8.  There are several problems

25  with that proposal.  First, it is undisputed that Fitbit was

26  selling its product in September 2008; it simply had not shipped

27  the products yet.  Park Decl. ¶ 13 ("On September 9 or September

28  10, 2008, Fitbit's website . . . . contained a description and

**United States District Court**
For the Northern District of California

images of the Fitbit fitness tracker <u>and invited any potential</u> <u>customer to order the product by clicking a prominent "BUY"</u> <u>button</u>.") (emphasis added).

Moreover, Fitbug's support for this rule rests on two flawed premises. First, Fitbug argues that "concrete evidence" of several of the likelihood of confusion factors in <u>AMF Inc. v. Sleekcraft</u> <u>Boats</u>, 599 F.2d 341, 348-49 (9th Cir. 1979) (the "<u>Sleekcraft</u> factors") was lacking in September 2008 (and is lacking in all pre-sale trademark infringement cases). But, as the Ninth Circuit has stated, "each [<u>Sleekcraft</u>] factor represents only a facet of the single dispositive issue of likely confusion," and need not be satisfied in every case or mechanically applied. <u>Entrepreneur</u> <u>Media, Inc. v. Smith</u>, 279 F.3d 1135, 1141 (9th Cir. 2002); <u>see also</u> <u>Downing v. Abercrombie & Fitch</u>, 265 F.3d 994, 1008 (9th Cir. 2001) ("Although these are all factors that are appropriate for consideration in determining the likelihood of confusion, they are not necessarily of equal importance, nor do they necessarily apply to every case."). Thus, even if evidence were lacking on the marketing channels and proximity of goods at sale factors, the two factors Fitbug specifically identified as lacking evidence in September 2008, that would not have barred a finding of likelihood of confusion at that time. Similarly, Fitbug's point that "evidence of widespread actual consumer confusion was not available until 2012" is misplaced, because <u>actual</u> confusion is not required to demonstrate a <u>likelihood</u> of confusion. <u>See</u> <u>Network Automation,</u> <u>Inc. v. Advanced Sys. Concepts, Inc.</u>, 638 F.3d 1137, 1151 (9th Cir. 2011); <u>see also</u> <u>Pfizer Inc. v. Sachs</u>, 652 F. Supp. 2d 512, 523 (S.D.N.Y. 2009) ("The absence of proof of actual confusion is not

1   fatal to a finding of likelihood, particularly where, as here, the

2   junior mark has been in the marketplace for a relatively short

3   period of time.") (citations and internal alterations omitted).

4       Fitbug's second argument, that between September 2008 and

5   September 2009 (when Fitbit first shipped its products) and it

6   appeared possible that Fitbit would go out of business, is

7   irreconcilable with the purpose of laches.  As Judge Learned Hand

8   wrote in the copyright context:

9       it is inequitable for the owner of a copyright, with full
        notice of an intended infringement, to stand inactive
10      while the proposed infringer spends large sums of money
        in its exploitation, and to intervene only when his
11      speculation has proved a success. Delay under such
        circumstances allows the owner to speculate without risk
12      with the other's money; he cannot possibly lose, and he
        may win.

13

14  Haas v. Leo Feist, Inc., 234 F. 105, 108 (S.D.N.Y. 1916); see also

15  Danjaq, 263 F.3d at 951 (discussing Hand's justification for laches

16  in the trademark context).  Here too, Fitbug's argument is that it

17  should be permitted to wait and watch, with full knowledge of

18  Fitbit's allegedly infringing use, as Fitbit invested substantial

19  sums of money in advertising and building up goodwill in its

20  allegedly infringing brand, only to intervene once those

21  investments panned out.  That result is not just inequitable, it is

22  also inefficient, and renders this argument untenable.  See also

23  Grupo Gigante, 391 F.3d at 1102-03 (noting that "the plaintiff

24  'cannot simply wait without explanation to see how successful the

25  defendant's business will be and then ask for an injunction to take

26  away good will developed by defendant in the interim.'") (quoting 5

27  McCarthy on Trademarks § 31:14, at 31-50).

28      The Court concludes that Fitbug had actual knowledge of its

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   potential causes of action against Fitbit in September 2008.  As a
2   result, the length of Fitbug's delay runs for approximately four
3   and a half years until it filed suit in March 2013.

4   Even though Fitbug delayed approximately four and a half years
5   before filing suit, that does not end the inquiry.  See Internet
6   Specialties, 559 F.3d at 991.  Instead, the Court must still decide
7   whether Fitbug's delay in bringing suit was reasonable.  Id.

8   In assessing whether a plaintiff's delay was reasonable, the
9   Court looks to the limitation period for the most analogous state
10  law cause of action.  Jarrow, 304 F.3d at 837.  If Fitbug's claims
11  were "filed within the analogous state limitation period, the
12  strong presumption is that laches is inapplicable; if the claim is
13  filed after the analogous limitations period has expired, the
14  presumption is that laches is a bar to suit."  Id. (collecting
15  cases); see also Internet Specialties, 559 F.3d at 990; Miller, 454
16  F.3d at 997.

17  The parties dedicate a significant amount of attention to the
18  question of what the most analogous cause of action is to trademark
19  infringement and unfair competition in California law, and what the
20  statute of limitations is for such claims.  For years, the Ninth
21  Circuit and district courts in California have almost universally
22  assumed the answer is the four-year limitation periods contained in
23  California Code of Civil Procedure Sections 337 or 343.  See, e.g.,
24  Internet Specialties, 559 F.3d at 990 n.2; Miller, 454 F.3d at 997
25  n.11; DC Comics v. Towle, 989 F. Supp. 2d 948, 971-72 (C.D. Cal.
26  2013); RSI Corp. v. IBM Corp., No. 5:08-cv-3414-RMW, 2012 WL
27  3277136, at *13 (N.D. Cal. Aug. 9, 2012); Experexchange, Inc. v.
28  Doculex, Inc., No. C-08-03875 JCS, 2009 WL 3837275, at *19 n.23

**United States District Court**
For the Northern District of California

1   (N.D. Cal. Nov. 16, 2009); ATM Express, Inc. v. ATM Express, Inc.,

2   Civ. No. 07cv1293-L(RBB), 2009 WL 2973034, at *3 (S.D. Cal. Sept.

3   11, 2009); Miller v. Glenn Miller Prods., 318 F. Supp. 2d 923, 942

4   n.11 (C.D. Cal. 2004), aff'd 454 F.3d 975, 997 & n.11 (9th Cir.

5   2006); but see Internet Specialties W., Inc. v. ISPWest, No. CV 05-

6   3296 FMC (AJWx), 2006 WL 4568073, at *1 (C.D. Cal. Nov. 14, 2006),

7   aff'd sub nom. Internet Specialties W., Inc. v. Milon-DiGrigorio

8   Enters., Inc., 559 F.3d 985 (9th Cir. 2009) (rejecting the

9   defendant's argument that the three-year period under California

10  Code of Civil Procedure Section 338(d) applied because the case

11  involved trademark infringement, and not false and deceptive

12  advertising under 15 U.S.C. Section 1125(a)(1)(B)); High Country

13  Linens, Inc. v. Block, No. C 01-02180 CRB, 2002 WL 1998272, at *2

14  n.1 (N.D. Cal. Aug. 20, 2002) (applying the two-year period in

15  California Code of Civil Procedure Section 339 to common law

16  trademark infringement claims).  However, Fitbit points out that

17  none of these cases actually analyze the question in depth, and in

18  nearly all the cases applying a four-year limitation, the parties

19  agreed that using the four-year period was appropriate.

20      Instead, Fitbit argues that the Ninth Circuit's references to

21  the four-year limitations period in Miller and Internet Specialties

22  overlooked important California precedent bearing on the statute of

23  limitations for trademark infringement and is inconsistent with

24  both California law and prior Ninth Circuit precedent.

25  Specifically, Fitbit argues that because the California Supreme

26  Court stated in Mission Imports, Inc. v. Superior Court, 31 Cal. 3d

27  921, 931 (Cal. 1982), that "action[s] for trademark infringement

28  sound[] in tort," the two-year limitations period for tort claims

14

United States District Court
For the Northern District of California

1  in California Code of Civil Procedure Section 339 applies.  See
2  also Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 719-20
3  (9th Cir. 2004) (applying Montana law and concluding that because a
4  claim for state trademark infringement "generally sounds in tort,"
5  Montana's three-year statute of limitations for unspecified tort
6  actions applied); High Country Linens, 2002 WL 1998272, at *2 n.1
7  (finding that "common law trademark infringement claim[s] [are]
8  also limited by Cal. Civ. Proc. Code § 339" in part because of
9  Mission Imports' holding that an "action for trademark infringement
10  sounds in tort").

11      While the Court believes that Fitbit's argument is
12  meritorious, and that the line of cases assuming the four-year
13  limitation period in Section 343 is applicable to trademark
14  infringement and unfair competition claims is questionable, the
15  Court need not resolve this issue.  Because the Court previously
16  found that the laches period began four and a half years before
17  Fitbug filed suit, Fitbug's claims are presumptively untimely even
18  under the four-year period it urges.  Accordingly, the Court
19  presumes that Fitbug's claims are untimely.  See Saul Zaentz, 627
20  F. Supp. 2d at 1113.  Nevertheless, the Court must still "consider
21  the validity of the reasons proffered by the plaintiff to excuse
22  its delay and overcome the presumption of laches."  Id.

23      First, Fitbug argues that the doctrine of progressive
24  encroachment justifies its delay.  "'Under this doctrine, the
25  trademark owner need not sue in the face of de minimis infringement
26  by the junior user.'"  Tillamook, 465 F.3d at 1110 (quoting
27  Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal., 694
28  F.2d 1150, 1154 (9th Cir. 1982).  "Instead, a trademark owner's

**United States District Court**
For the Northern District of California

1  obligation to sue arises when the junior user redirects or expands

2  its business into different regions or markets bringing it into

3  direct competition with the trademark owner." Saul Zaentz, 627 F.

4  Supp. 2d at 1114 (citing Tillamook, 465 F.3d at 1110); see also

5  Grupo Gigante, 391 F.3d at 1103 ("A defendant can encroach on a

6  plaintiff's mark by expanding its business into different regions

7  or different markets."). Nevertheless, "[a] junior user's growth

8  of its existing business and the concomitant increase in its use of

9  the mark do not constitute progressive encroachment." Tillamook,

10 465 F.3d at 1110.

11     Specifically, Fitbit argues that the doctrine of progressive

12 encroachment applies because Fitbit expanded into the so-called

13 'business-to-business-to-consumer' market "no earlier than mid-

14 2011, less than two years before Fitbug filed suit."  Fitbit Opp'n

15 at 9.  As explained earlier, the business-to-business-to-consumer

16 market is made up of health insurance plans and corporate wellness

17 programs, among others, and makes up a significant (although not

18 always the majority, see Wakefield Decl. ¶¶ 5, 9, Ex. 4 at

19 Interrog. No. 18, Ex. 8) share of Fitbug's sales.

20     Fitbug bases its view of Fitbit's alleged progressive

21 encroachment on the declaration of its CEO, Paul Landau, who

22 contends that:

23     "[f]rom 2008 through the [sic] mid-2011, it was the
       understanding of myself and others at Fitbug[2] that Fitbit
24

---

25 [2] Landau's description of Fitbit's activities throughout the
   relevant period is insufficient to create an issue of material fact
26 as to Fitbit's activities because Landau's testimony on those
   issues would be inadmissible. See Fed. R. Civ. P. 56(c)(4); Orr v.
27 Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial
   court can only consider admissible evidence in ruling on a motion
28 for summary judgment.") (citations omitted).

was focusing its distribution efforts on the direct to
consumer channel . . . . [and] to the extent Fitbit was
selling its products through the [business-to-business-
to-consumer] market, (a) its distribution was in the form
of offering bulk discounts to [business-to-business-to-
consumer] customers, (b) such sales were almost
exclusively a result of potential [business-to-business-
to-consumer] customers reaching out to Fitbit as opposed
to Fitbit initiating marketing contact, and (c) Fitbit
was not providing Add-On Services to its [business-to-
business-to-consumer] customers.

Landau Decl. ¶ 18.  Fitbug describes "Add-On Services" as

including, among other things, collecting and analyzing additional

data for business-to-business-to-consumer customers, creating

separate web pages for business-to-business-to-consumer users, and

offering additional exercise games or challenges in which fitness

groups may participate.  <u>Id.</u> at ¶ 5.  "To Fitbug, if a distributor

of activity trackers to [business-to-business-to-consumer]

customers was not providing Add-On Services to these customers,

that distributer [sic] was effectively not a participant in the

[business-to-business-to-consumer] market and as a result, not a

competitor of Fitbug."  <u>Id.</u> at ¶ 18.  Furthermore, Fitbug points

out that Fitbit did not add a "Corporate Wellness" link on its

website, which specifically targets the business-to-business-to-

consumer market, until April 2012.  Finally, Fitbug contrasts

Fitbit's business-to-business-to-consumer sales in 2009, which were

only a small percentage of Fitbit's overall sales, with its 2013

business-to-business-to-consumer sales, which accounted for

substantially larger percent of Fitbit's sales.  ECF No. 66

("Rosenberg Decl.") Ex. 6.

     The problem with this view is that Fitbit's growth in the

business-to-business-to-consumer market was simply the growth of

its existing business, not expansion into a new market.  Even

**United States District Court**
For the Northern District of California

1   drawing all justifiable inferences in Fitbug's favor, see Anderson,

2   477 U.S. at 255, the undisputed facts show that Fitbit was selling

3   its products directly to consumers and businesses from the outset.

4   Park Decl. ¶ 28.  Furthermore, Fitbit hired an independent

5   contractor in 2008 in an effort to develop additional business-to-

6   business-to-consumer sales.  ECF No. 46-9 ("McDonough Decl.") at ¶¶

7   3-6.  Additionally, it is also undisputed that Fitbit received

8   inquiries from and made sales to business-to-business-to-consumer

9   customers from its inception.  Id. at ¶ 7.  While Fitbug points out

10  that Fitbit's sales in the business-to-business-to-consumer market

11  have grown substantially, it is also undisputed that Fitbit had

12  sales in that market since its inception.  As the Ninth Circuit has

13  said, "growth alone does not infringement make," Prudential Ins.,

14  694 F.2d at 1154, and all phases of Fitbit's business grew rapidly

15  from the beginning, including its business-to-business-to-consumer

16  sales.  See Wakefield Decl. at Ex. 7.

17      Nor do the facts support Fitbug's view that Fitbit's initial

18  use of its mark was de minimis.  On the contrary, Fitbit's use of

19  its mark was substantial from the outset, and Fitbit received both

20  national and international media attention at the beginning.  Park

21  Decl. ¶¶ 12-13, 34.  In short, this media attention and prominent

22  use of the mark (as well as Fitbug's internal response) demonstrate

23  that even if "[Fitbug] may have had no obligation to sue a small

24  one-shop brick and mortar infringer, [Fitbit's] use of the mark was

25  not de minimis."  Saul Zaentz, 627 F. Supp. 2d at 1115.

26      Further underscoring these conclusions, two years before

27  Fitbug argues Fitbit entered the business-to-business-to-consumer

28  market, Fitbug knew or should have known the two companies were

**United States District Court**
For the Northern District of California

directly competing in that market.  First, Fitbug's CEO admits that
in 2009 Fitbug and Fitbit were competing directly to provide a
fitness program for several schools.  ECF No. 67 ("Landau Opp'n
Decl.") ¶ 8.  Similarly, although the program was to take place in
Europe and Fitbug's CEO was apparently unaware of Fitbit's
participation, representatives of Oracle UK (a prospective
business-to-business-to-consumer customer) copied Landau, Fitbit
CEO James Park, and representatives of several other portable
electronic fitness tracking device companies on the same emails
regarding a potential corporate wellness program.  Id. at ¶¶ 10-11;
Park Decl. ¶¶ 23-25 & Exs. 9-10.  Even though Fitbug's CEO states
he was personally unaware of that instance of direct competition in
the business-to-business-to-consumer market, "[h]ad [Fitbug]
conducted further investigation, as a reasonable person would have
done . . . , it would have discovered that [Fitbit]" had been
directly competing with Fitbug in the business-to-business-to-
consumer market from the outset.  Saul Zaentz, 627 F. Supp. 2d at
1112.

    Also undermining Fitbug's argument is its artificial and
cramped description of the relevant market.  Fitbug states that, in
its view, unless another portable electronic fitness tracker
company was providing similar Add-On Services to those Fitbug
provided, that company was effectively not a competitor in the
business-to-business-to-consumer market.  But Fitbug offers no
objective explanation for why this is the case, and in any event, a
close reading of the Ninth Circuit's progressive encroachment cases
shows that expansion into a "different market" requires something
more than simply expanding existing marketing channels or

1  increasing sales in an area closely related to the junior mark

2  holder's existing business.

3      Take, for instance, the Ninth Circuit's analysis of

4  progressive encroachment in Tillamook Country Smoker, Inc. v.

5  Tillamook Community Creamery Association.  In Tillamook, the

6  plaintiff was a cheese company suing a defendant smoked meat

7  company, both located in Tillamook County, Oregon.  465 F.3d at

8  1105.  While the cheese company was aware of the meat company from

9  the outset, it did not sue until twenty-five years later, once the

10 meat company began selling its products in supermarkets -- a move

11 the cheese company argued constituted progressive encroachment.

12 Id. at 1105, 1110.  The Ninth Circuit disagreed, finding that the

13 meat company's expansion into supermarket sales was not an

14 expansion into a different region or different market, but rather

15 "growth of its existing business and the concomitant increase in

16 its use of the mark . . . ."  Id. at 1110.  In so doing, the

17 Tillamook court noted that if the meat company had "'expanded its

18 business' into selling cheese in grocery stores, it would be a

19 different story."  Id.; see also Internet Specialties, 559 F.3d at

20 991 (expanding from localized sales of dial up service to

21 nationwide DSL service was "a natural growth of . . . existing

22 business); Grupo Gigante, 391 F.3d at 1103 (rejecting progressive

23 encroachment where the plaintiff was aware of a potential conflict

24 but chose to wait to bring suit until the conflict was actual);

25 Saul Zaentz, 627 F. Supp. 2d at 1115 (finding the move to internet

26 sales "was the natural outgrowth of [the defendant's] existing

27 business," and "the fact that [plaintiff's] internet sales predate

28 [defendant's] sales is immaterial").

1    Similarly, in this case, any expansion into the business-to-

2   business-to-consumer market (no matter how that market is

3   constituted) was simply the natural growth of Fitbit's existing

4   business.  If Fitbit had only entered the portable electronic

5   fitness tracking market after several years of marketing distinct

6   products, the Court might reach a different conclusion.  But here,

7   Fitbit was selling the same type of products, to the same type of

8   customers, with the actual or constructive knowledge of Fitbug from

9   2008 through 2011 and beyond.  See Grupo Gigante, 391 F.3d at 1103

10  (rejecting a progressive encroachment claim where defendant's use

11  of the mark did not change over the relevant period); accord 6

12  McCarthy on Trademarks & Unfair Competition § 31:20 (4th ed.)

13  ("Progressive encroachment denotes some change in direction, such

14  as expansion into different territories or into a different type of

15  business.  It must be something more than a normal expansion in

16  quantity within its original line of business that most businesses

17  will experience over time.").  In short, the undisputed facts

18  simply do not support Fitbug's view that Fitbit's subsequent

19  activities constituted a move into the "same or similar market

20  area" or placed Fitbit "more squarely in competition with

21  [Fitbug]," because the companies were already squarely competing in

22  the same or similar market area beginning in 2008.  Opp'n at 10

23  (quoting Kellogg Co. v. Exxon Corp., 209 F.3d 562, 573 (6th Cir.

24  2000)).

25    Despite the presumption in favor of laches and Fitbug's

26  inability to show progressive encroachment, the Court must still

27  weigh a series of factors to determine whether Fitbug's delay in

28  bringing suit was reasonable.  Specifically, these factors, the so-

1  called <u>E-Systems</u> factors, direct the Court to analyze "(1) the

2  strength and value of the trademark rights asserted; (2)

3  plaintiff's diligence in enforcing [the] mark; (3) harm to [the]

4  senior user if relief is denied; (4) good faith ignorance by [the]

5  junior user; (5) competition between [the] senior and junior users;

6  and (6) [the] extent of harm suffered by the junior user because of

7  [the] senior user's delay." <u>E-Systems, Inc. v. Monitek, Inc.</u>, 720

8  F.2d 604, 607 (9th Cir. 1983); <u>see also</u> <u>Tillamook</u>, 465 F.3d at

9  1108.

10       The first two factors weigh in Fitbit's favor.  First, while

11  both Fitbit's and Fitbug's marks are descriptive or suggestive, and

12  thus relatively weak, <u>see</u> <u>Grupo Gigante</u>, 391 F.3d at 1102

13  ("Descriptive or suggestive marks are relatively weak.") (citing

14  <u>Accuride Int'l Inc. v. Accuride Corp.</u>, 871 F.2d 1531, 1536 (9th

15  Cir. 1989); <u>ATM Express</u>, 2009 WL 2973034, at *4, on balance,

16  Fitbit's mark is substantially more valuable by virtue of its

17  "rapid and continuing growth" relative to Fitbug.  <u>See</u> <u>E-Systems</u>,

18  720 F.2d at 607.  As a result, this factor weighs in Fitbit's

19  favor.  Second, as discussed throughout the foregoing analysis,

20  Fitbug was not diligent in protecting its mark and did not assert

21  its trademark rights against Fitbit's from September 2008, when

22  Fitbit announced its products and began offering them for sale on

23  its website, to December 2011, when it sent a cease and desist

24  letter to Fitbit, and did not file suit until 2013.  As the Court

25  has explained, this delay was not justified, and accordingly this

26  factor weighs against Fitbug.

27       The third factor and fifth factors either weigh in Fitbug's

28  favor or can be assumed to do so for the sake of argument.  The

**United States District Court**
For the Northern District of California

1   third factor, the harm to Fitbug if relief is denied, "turns

2   largely on the court's analysis of the likelihood of confusion."

3   RSI, 2012 WL 3277136, at *18 (citing Grupo Gigante, 391 F.3d at

4   1103).  But here, the Court cannot find that the likelihood of

5   confusion standard is satisfied as a matter of law because there

6   are genuine issues of material fact as to several of the Sleekcraft

7   factors.  See 559 F.2d at 348-49.  In particular, there are

8   disputed factual issues going to the existence of actual confusion,

9   as well as the similarity of the parties' marks and sophistication

10  and care "likely to be exercised by the purchaser[s] . . . ."  Id.

11  at 348; see Fitbit Opp'n at 16-22 (detailing these factual

12  disputes).  As a result, the Court cannot decide likelihood of

13  confusion (and hence the weight of this factor) as a matter of law.

14  Nonetheless, even assuming this factor weighs strongly in Fitbit's

15  favor, as the fifth factor, competition between the users, does,

16  see RSI, 2012 WL 3277136, at *18 (citing Grupo Gigante, 391 F.3d at

17  1104) (noting that where both parties offer "similar products to

18  the same companies in the same market, [the competition between

19  users] factor plainly weighs against a finding of laches"), it

20  would still be insufficient to sway the overall weight of the

21  factors.

22      The remaining factors, good faith ignorance by Fitbit and the

23  harm suffered by Fitbit as a result of Fitbug's delay weigh in

24  Fitbit's favor as well.  First, while it is undisputed that Fitbit

25  was aware of Fitbug's existence prior to announcing or selling its

26  products, it is also undisputed that Fitbit selected its mark

27  before it was aware of Fitbug, and even after learning of Fitbug's

28  existence, Fitbit continued to believe there was no likelihood of

confusion.  Because this factor focuses on whether "[Fitbit] had
prior knowledge of [Fitbug] <u>when it decided to adopt</u> the name
[Fitbit]," this factor weighs in Fitbit's favor.  <u>Internet</u>
<u>Specialties</u>, 2006 WL 4568073, at *4, <u>aff'd</u> 559 F.3d 985 (9th Cir.
2008) (emphasis added).  Furthermore, because Fitbit "has continued
to build a valuable business around its trademark during the time
that [Fitbug] delayed the exercise of its legal rights," it has
suffered "expectation" or "economic prejudice."  <u>Grupo Gigante</u>, 391
F.3d at 1105; <u>see also</u> <u>Danjaq</u>, 263 F.3d at 956 (discussing economic
prejudice); <u>McCarthy</u> § 31:12 (discussing expectation prejudice).
Here, Fitbit has provided substantial evidence detailing its
efforts through the period of Fitbug's delay to build its business,
generating substantial sales, hiring large numbers of employees,
and developing products, all of which it offers under the well-
known Fitbit mark.  Those efforts, and Fitbit's products, have
garnered awards and substantial media coverage.  The economic
prejudice would be severe if Fitbit were to now lose the rights to
the Fitbit name.  <u>See</u> <u>Saul Zaentz</u>, 627 F. Supp. 2d at 1118
(reaching a similar conclusion where the defendant had spent
millions of dollars on advertising, appeared on television
promoting its business, and generated substantial goodwill under
its existing name).

     Nevertheless, Fitbug argues, relying on two out-of-
jurisdiction authorities, that Fitbit cannot be prejudiced because
Fitbit knew of Fitbug's rights prior to making these investments.
<u>See</u> <u>Roederer v. J. Garcia Carrion, S.A.</u>, 569 F.3d 855, 859 (8th
Cir. 2009); <u>Perini Corp. v. Perini Constr., Inc.</u>, 715 F. Supp. 719,
725 (D. Md. 1989), <u>rev'd on other grounds</u>, 915 F.2d 121 (4th Cir.

1990).  But Fitbit points out that the Ninth Circuit and other
courts have found prejudice even where the defendant was aware of
the plaintiff's existence prior to the prejudice occurring.  See,
e.g., Danjaq, 263 F.3d at 956; Saul Zaentz, 627 F. Supp. 2d at 1118
(finding the defendant would suffer economic prejudice even though
it chose its business name with full knowledge of the plaintiff's
mark).  Furthermore, one of the cases on which Fitbug relies for
this argument, Roederer, applied this limitation on prejudice only
where "plaintiff objected to the use of the mark."  569 F.3d at
859.  However as the Court found earlier, Fitbug did not object to
Fitbit's use of its mark until its cease-and-desist letter in
December of 2011, after Fitbit had already expended substantial
effort building up good will in its mark.  As a result, the Court
rejects this argument and finds that Fitbit's claim of laches is
supported by substantial economic prejudice.

Considering the above factors, the Court finds they weigh in
Fitbit's favor.  Nonetheless, Fitbug has one remaining argument:
that Fitbit's willful infringement bars it from asserting laches.

Because laches is an equitable doctrine, the exception to
laches for willful infringers stems from "the equitable maxim that
'he who comes into equity must come with clean hands.'"  Danjaq,
263 F.3d at 956 (9th Cir. 2001) (quoting Hermes Int'l v. Lederer de
Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000)).  This
rule was originally applied by Judge Hand in the copyright piracy
context and was subsequently applied to "intentional and
fraudulent" trademark infringement by the Ninth Circuit.  See Nat'l
Lead Co. v. Wolfe, 223 F.2d 195, 202 (9th Cir. 1955) (citing
Menendez v. Holt, 128 U.S. 514, 523 (1888)); Haas, 234 F. at 108.

United States District Court
For the Northern District of California

1  Hand mused that while all would agree "that it is inequitable for

2  the owner of a copyright, with full notice of an intended

3  infringement, to stand inactive while the proposed infringer spends

4  large sums of money in violation, and to intervene only when his

5  speculation proved a success," such a course of conduct by a

6  copyright owner "might be irrelevant" if "the defendant [is] a

7  deliberate pirate . . . ." Haas, 234 F. at 108.

8      In Danjaq LLC v. Sony Corp., the Ninth Circuit held that the

9  Copyright Act's definition of willful infringement -- infringement

10 that occurs "'with knowledge that the defendant's conduct

11 constitutes copyright infringement'" -- is the standard by which

12 courts should assess whether willful infringement bars the

13 application of laches.  263 F.3d at 957 (quoting Columbia Pictures

14 Television v. Krypton Broad., 106 F.3d 284, 293 (9th Cir. 1997)

15 (alterations and omissions in original) rev'd on other grounds sub

16 nom. Feitner v. Columbia Pictures Television, 523 U.S. 340 (1998)).

17 At least one other district court in the Ninth Circuit has applied

18 this standard to trademark infringement, and the parties do not

19 dispute that it applies here.  See FLIR Sys. Inc. v. Sierra Media,

20 Inc., 965 F. Supp. 2d 1184, 1210 (D. Or. 2013).

21     Fitbug points to four facts that it believes demonstrate

22 willful infringement.  First, "it is undisputed that Fitbit learned

23 about Fitbug nearly two years before selling any products (and

24 nearly one year before even announcing such products)."  Fitbug

25 Opp'n at 3.  Second, pointing to screenshots of Fitbit's and

26 Fitbug's websites, Fitbug argues that "Fitbit . . . borrowed

27 significant design elements from Fitbug's website, marketing

28 materials, and original logo."  Id.; Landau Decl. Exs. 15-18.

1   Third, Fitbit continued using its marks after receiving a cease and

2   desist letter from Fitbug alleging infringement.  Finally, Fitbug

3   disputes Fitbit's view that "it began using the FITBIT mark before

4   learning of Fitbug's prior rights in FITBUG."  Fitbug Opp'n at 3

5   n.2.

6       The willfulness exception is inapplicable here because Fitbug

7   can show "at most only infringement, not willful infringement,"

8   Danjaq, 263 F.3d at 942, and Fitbug has offered no evidence

9   "demonstrating that [Fitbit] 'employed the alleged infringing mark

10  with the wrongful intent of capitalizing on its goodwill.'"  RSI

11  Corp. v. IBM Corp., No. 5:08-cv-3414-RMW, 2012 WL 3277136, at *20

12  (N.D. Cal. Aug. 9, 2012).  First, while it is undisputed that

13  Fitbit learned about Fitbug prior to announcing or selling its

14  products, in the bad faith infringement context numerous courts

15  have found that "[p]rior knowledge of a senior user's trademark

16  does not necessarily give rise to an inference of bad faith and may

17  be consistent with good faith."  Arrow Fastener Co. v. Stanley

18  Works, 59 F.3d 384, 397 (2d Cir. 1995); see also McCarthy § 23:115

19  at n.13 (collecting cases).  Nevertheless, Fitbug suggests that the

20  Court should infer bad faith here because "defendant had knowledge

21  of plaintiff's mark 'and 'just happened' to choose a mark

22  confusingly similar to plaintiff's mark.'"  Fitbug Opp'n at 3 n.2

23  (quoting McCarthy, supra, at § 23:115).  But this overstates the

24  facts.  First, as the Court discussed earlier, there is no evidence

25  that Fitbit was aware of Fitbug's mark at the time it chose the

26  Fitbit name.  Instead, the record simply demonstrates that Fitbit

27  was ignorant of Fitbug's existence until late 2007, after it chose

28  the Fitbit name but before it announced or began marketing its

27

products under that name.  Furthermore, even though Fitbit was aware of Fitbug prior to announcing or marketing its products, Fitbug provides no evidence disputing Fitbit's asserted good faith belief that its use is not infringing and nothing showing a "wrongful intent of capitalizing on [Fitbug's] goodwill." RSI, 2012 WL 3277136, at *20 (quotation omitted).  On the contrary, it is undisputed that, at the time he learned of Fitbug, Fitbit's CEO believed the names were not confusingly similar.  As the Ninth Circuit has recognized, citing approvingly a case from the Sixth Circuit, "a knowing use in the belief that there is no confusion is not bad faith." Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400, 1406 (9th Cir. 1993) (citing Nalpac, Ltd. v. Corning Glass Works, 784 F.2d 752, 755 (6th Cir. 1986)).

As a result, the Court finds that willful infringement does not bar Fitbit from invoking laches, and Fitbug's claims are time-barred.  Accordingly, Fitbit's motion for summary judgment on the issue of laches is GRANTED.  Further, because Fitbug's claims are time-barred, the portion of Fitbit's motion for summary judgment addressing acquiescence need not be addressed, and Fitbug's motion for summary judgment on likelihood of confusion is DENIED as moot.

## B.   **Fitbit's Fifth and Sixth Counterclaims**

The only remaining issue is Fitbug's motion for summary judgment as to Fitbit's fifth and sixth counterclaims, which assert claims for violations of California's Unfair Competition Law ("UCL") and False Advertising Law ("FAL"). See Cal. Bus. & Prof. Code §§ 17200; 17500.  These causes of action relate to allegations that Fitbug violated the UCL and FAL by posting online reviews and comments about Fitbit products or comparing Fitbit's products to

28

United States District Court
For the Northern District of California

1  Fitbug's without disclosing their affiliations with Fitbug.

2      Fitbug argues that it is entitled to summary judgment on these

3  claims because Fitbit cannot satisfy the requirement that a UCL or

4  FAL plaintiff demonstrate it "suffered injury in fact and . . .

5  lost money as a result of" the unfair competition or false

6  advertising.  See Id. §§ 17204; 17535.  Because a UCL or FAL

7  plaintiff must demonstrate an economic injury and demonstrate that

8  "the misrepresentation was an immediate cause" of the injury

9  suffered, standing under the UCL and FAL is "substantially narrower

10 than federal standing under [A]rticle III."  In re Tobacco II

11 Cases, 46 Cal. 4th 298, 326 (Cal. 2009) (internal citation and

12 quotation marks omitted); see also Kwikset Corp. v. Super. Ct., 51

13 Cal. 4th 310, 323-24 (Cal. 2011).

14     The background of this issue is somewhat convoluted, but it

15 stems from a stipulation the parties entered into in response to

16 Fitbit's desire to amend its counterclaims late in the discovery

17 process.  When Fitbit sought to amend its counterclaims, Fitbug

18 apparently sought to depose a Fitbit representative regarding those

19 counterclaims.  Fitbit initially agreed, but then the parties

20 reached an agreement that, in exchange for not providing the

21 witness for deposition, Fitbit and Fitbug would stipulate that,

22 among other things, Fitbit did not have evidence of "particular

23 instances where individuals who otherwise would have purchased

24 Fitbit products instead purchased Fitbug products in reliance on or

25 as a result of Fitbug's conduct" that allegedly violated the UCL

26 and FAL.  ECF No. 49 ("Rosenberg Decl.") Ex. 17 at ¶ 1.

27     In response, Fitbit points to several cases holding that, in

28 the Lanham Act context, injury in fact may be presumed for

1   intentionally deceptive advertising.  <u>See</u> <u>Southland Sod Farms v.</u>

2   <u>Stover Seed Co.</u>, 108 F.3d 1134, 1146 (9th Cir. 1997); <u>U-Haul Int'l,</u>

3   <u>Inc. v. Jartran, Inc.</u>, 793 F.2d 1034, 1040 (9th Cir. 1986); <u>Nat'l</u>

4   <u>Prods., Inc. v. Gamber-Johnson LLC</u>, 699 F. Supp. 2d 1232, 1241

5   (W.D. Wash. 2010).  But these cases do not rebut Fitbug's argument.

6   Fitbug's argument is that, <u>as a matter of California law</u>, the

7   statutory standing requirement imposed by Business and Professions

8   Code Sections 17204 and 17535 require Fitbit to demonstrate an

9   economic injury cognizable under the UCL or FAL.  These cases only

10  address those requirements in the context of the Lanham Act, and

11  are thus inapposite.

12       Next, Fitbit points to California cases holding that a UCL or

13  FAL plaintiff can satisfy the statutory standing requirements in

14  "innumerable ways" and that "the quantum of lost money or property

15  necessary to show standing" under the UCL and FAL is "only so much

16  as would suffice to establish injury in fact and it suffices to

17  allege some specific, identifiable trifle of injury." <u>Law Offices</u>

18  <u>of Matthew Higbee v. Expungement Assistances Servs.</u>, 214 Cal. App.

19  4th 544, 561 (Cal. Ct. App. 2013) (citations and internal

20  quotations omitted).  However, Fitbit cannot satisfy even that

21  standard.  Instead, Fitbit's sole basis for asserting an injury

22  under the UCL and FAL is speculation.  While Fitbit points out that

23  Fitbug saw an increase in web traffic and sales following the

24  alleged UCL and FAL violations, Fitbit cannot connect that increase

25  with any "quantum of lost money or property" it suffered.  <u>Id.</u>

26  Similarly, while Fitbug internally estimated that this campaign

27  would generate significant revenues, there is nothing in the record

28  demonstrating that the campaign actually was responsible for any

1  loss of money or property by Fitbit.

2       As a result, Fitbit has failed to demonstrate even a

3  "specific, identifiable trifle of injury" sufficient to satisfy the

4  standing requirements of the UCL or FAL.  Id.  Accordingly,

5  Fitbug's motion is GRANTED as to Fitbit's fifth and sixth

6  counterclaims.

7

8  **V.    CONCLUSION**

9       For the reasons set forth above, Fitbit's motion for summary

10 judgment on the grounds of laches is GRANTED.  Because Fitbug's

11 claims are time-barred, the Court need not address Fitbit's

12 arguments for summary judgment on the grounds of acquiescence, and

13 Fitbug's motion for summary judgment on the grounds of likelihood

14 of confusion is DENIED as moot.  Fitbug's motion for summary

15 judgment on Fitbit's fifth and sixth counterclaims is GRANTED.

16 Because, based on the Court's review of the parties' pleadings this

17 order fully disposes of the parties' claims, the trial date,

18 pretrial conference, and all other pretrial deadlines are hereby

19 VACATED.

20

21      IT IS SO ORDERED.

22

23      Dated: January 26, 2015

24                                UNITED STATES DISTRICT JUDGE

25

26

27

28

**United States District Court**
For the Northern District of California